# United States Court of Appeals
## For the First Circuit

No. 99-1456

DONALD PARKER, MARIA JESUSA VAZQUEZ PARKER,
AND THEIR CONJUGAL PARTNERSHIP, MARIA A. PARKER VAZQUEZ,
MINOR,
and JOHANNA PARKER VAZQUEZ, MINOR,

Plaintiffs, Appellants,

v.

UNIVERSIDAD DE PUERTO RICO, GENERAL ACCIDENT INSURANCE CO.,
and JOHN DOE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jesús A. Castellanos, U.S. Magistrate Judge]

Before

Torruella, Chief Judge,
Coffin, Senior Circuit Judge,
and Lipez, Circuit Judge.

Jane Becker Whitaker, with whom Troncoso & Becker was on
brief, for appellants.

Vanessa-Viera Rabelo, with whom Jeannette López-de Victoria
and Pinto-Lugo & Rivera were on brief, for appellees.

August 28, 2000

**LIPEZ, <u>Circuit Judge</u>**.   Beneath the surface of this seemingly simple case, there are issues of considerable complexity and import.   Strikingly, they were largely missed by the parties.

## I.

The plaintiffs, Donald Parker, his wife, their conjugal partnership, and their two daughters (collectively, the "Parkers"), brought suit in the United States District Court for the District of Puerto Rico, seeking compensatory damages under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 <u>et</u> <u>seq.</u>, and Article 1802 of the Puerto Rico Civil Code, 31 L.P.R.A. § 5141, for injuries suffered by Parker when his wheelchair overturned during a visit to the University of Puerto Rico's Botanical Gardens.   After the Parkers concluded their case-in-chief during a jury trial, the magistrate judge granted judgment as a matter of law in favor of the University and the other named defendants, concluding that the Parkers had failed to present sufficient evidence to establish that Parker had been discriminated against by reason of his disability.

Our review of the district court's ruling requires us to examine in some detail the requirements imposed by the ADA on

public entities. Finding the evidence sufficient to make out a prima facie case under the ADA, we vacate the judgment against the Parkers and remand to the district court for further proceedings. To avoid any misunderstandings about the significance of our decision, we also note briefly at the conclusion of the decision two legal issues never addressed by the parties: (1) whether Title II of the ADA permits plaintiffs to recover compensatory damages for a personal injury that results from a structural defect in a public facility which prevented the access of a disabled person to the services, programs, or activities of a public entity; and (2) the possibility of an Eleventh Amendment sovereign immunity defense for the University.

## II.

We present the evidence in the light most favorable to the Parkers, the party opposing judgment as a matter of law. See Lynch v. City of Boston, 180 F.3d 1, 9 (1st Cir. 1999). The Botanical Gardens of the University of Puerto Rico comprise 300 acres of flora that serve as a laboratory for study, research, and conservation, and are also open to the general public for recreational use. The Girl Scouts of America hosted an awards ceremony at the Monet Garden, a site within the Botanical Gardens that recreates the original Monet Garden in

Giverny, France. Parker and his wife, María Jesusa Vázquez, decided to attend the ceremony because they and their two daughters were active in the Girl Scouts. A prior stroke having left Parker without the use of his legs, he planned to move about the park using his motorized wheelchair.

Upon arrival at the park's front gate, park officials told Parker and Vázquez that there was handicap parking available. The park officials instructed those planning to attend the Girl Scout ceremony to proceed to the Monet Garden. Parker and Vázquez then drove to the parking lot adjacent to the park's entrance. Finding that lot full, they proceeded to another parking area closer to their final destination in the park. Vázquez asked park security guards to help unload her husband's wheelchair from the van, and the guards obliged. Realizing that Parker and Vázquez were headed to the Monet Garden, one of the guards indicated that there was a pathway "over there."

Parker took that path and descended toward the Monet Garden, Vázquez walking several steps in front to guide him, as was her custom. Parker noticed that the path had loose gravel on it and was not designed to be a handicapped ramp. As Parker neared the bottom of the path, his wheelchair flipped and he landed on his right side. Although Parker could not say what

caused his fall, and the Parkers presented no eyewitness account of the fall, Vázquez testified that she immediately turned around and noticed that there was a two-inch dropoff to the ground at the end of the paved path at the place where her husband had fallen and that, in her opinion, this two-inch dropoff caused the fall. After getting back into his wheelchair, Parker stayed to attend the awards ceremony, and then left the Monet Garden by a different path.

Parker subsequently went to the hospital where it was determined that he had broken his clavicle as a result of the accident. Prior to the accident, Parker had labored for two years in physical therapy to regain the use of his right arm after his debilitating stroke. Through his effort, he had recovered to the point where he was able to dress himself and to use the bathroom without his wife's assistance. The accident at the Monet Garden destroyed all the progress Parker had made since his stroke, rendering his right arm once again useless.

The Parkers filed suit against the University and the other named defendants primarily seeking compensatory damages for injuries suffered as a result of Parker's fall. In particular, the complaint asserted that the University's "failure to remedy its violations of the ADA, inter alia, the lack of signage, the failure to make all ramps flush to the

-5-

ground, and the [park guard's] instructions to use the noncompliant ramp, provide the Parkers with a cause of action for all remedies available in law and equity." At trial, five witnesses testified for the Parkers: Donald Parker, María Vázquez, their two daughters, and Julie Escudero, a friend of the Parkers who attended the Girl Scout event with her disabled son. Of these witnesses, only Parker, Vázquez, and Escudero were present at the park on the day of the accident. Escudero testified that she and her son, who was disabled and used a wheelchair, had reached the Monet Garden using a different route than the one traveled by Mr. Parker. After the Parkers concluded their case-in-chief, the district court granted judgment as a matter of law in favor of the defendants. This appeal followed.

## III.

### A.  Title II of the ADA

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title I of the ADA prohibits discrimination in employment. See id. § 12112. Title III prohibits discrimination in access to public accommodations like hotels, restaurants, and theaters. See id. §§ 12182, 12184.

Title II, the provision at issue here, prohibits discrimination against persons with disabilities by "public entities,"[1] and is modeled on § 504 of the Rehabilitation Act, Pub. L. No. 93-112, 87 Stat. 355 (1973) (codified as amended in scattered sections of 29 U.S.C.).[2] In applying Title II, therefore, we rely interchangeably on decisional law applying § 504. See Theriault v. Flynn, 162 F.3d 46, 48 n.3 (1st Cir. 1998); Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir. 1998).

Title II incorporates by reference the enforcement scheme found in § 505 of the Rehabilitation Act. See 42 U.S.C. § 12133. Section 505, in turn, authorizes "any person aggrieved by any act or failure to act" to obtain the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 [42 U.S.C. § 2000d et seq. (prohibiting discrimination on the basis of race, color, or national origin in any program receiving Federal financial assistance)]" 29

---

[1] A "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B). The University of Puerto Rico does not contest that it is a "public entity."

[2] Title II essentially extends the reach of § 504 to state and local governmental entities that do not receive federal financial assistance. See 29 U.S.C. § 794(a) (limiting scope of the Rehabilitation Act to entities receiving Federal funds).

U.S.C. § 794a(a)(2).[3]  Although Title VI does not expressly authorize a private cause of action, the Supreme Court has found an implied private cause of action under that statute.  See generally Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582 (1983).

## B.  Requisites of a Title II Claim

Our task in construing Title II's applicability in the case at hand is a difficult one.  Although Title II of the ADA took effect on January 26, 1992,[4] there is sparse caselaw interpreting its scope and limits.  See Accessibility Under the Americans With Disabilities Act and Other Laws 118 (Earl B. Slavitt & Donna J. Pugh eds., ABA 2000) (noting that few cases have been decided to date under either Title II or Title III of the ADA).  Neither party directs us to any case in which Title II has supported a claim for damages resulting from a personal injury to a disabled person that occurred at a location operated by a public entity.  Our research likewise has produced no case directly on point.

---

[3]     Another part of § 505 applies in cases of employment discrimination and adopts by reference Title VII of the Civil Rights Act of 1964.  See 29 U.S.C. § 794a(a)(1).

[4]     With certain exceptions, Titles I and II took effect on January 26, 1992, and Title III took effect on July 26, 1990. See 5 Cook & Sobieski, Civil Rights Actions ¶ 22A.02, at 22A-26, 22A-28 (2000); First Bank Nat. Assoc. v. FDIC, 79 F.3d 362, 371 n.9 (3d Cir. 1996).

We begin our analysis with the language of the statute. Title II provides, inter alia, that

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Pursuant to the plain language of Title II, a plaintiff must establish: (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability. The University does not dispute that Parker is a "qualified individual with a disability." See id. § 12131(2) (defining "qualified individual with a disability" as an "individual with a disability who, with or without reasonable modifications . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity"). To the extent that the alleged defect in the path prevented Parker from using his wheelchair to access the Monet Garden safely, it is self-evident that it did so "by reason of" his disability.

That leaves us to decide whether the Parkers established a prima facie case that Parker was denied access to the University's "services, programs, or activities" within the meaning of Title II. Having examined the duties imposed by Title II on public entities and the evidence presented by the Parkers, we conclude that they did so.

## C. A Public Entity's Duties Under The ADA

The language of Title II does not elaborate on the obligation of a public entity to an individual with a disability in the provision of "services, programs, or activities." We must rely for specifics on the regulations promulgated under Title II.[5] The core "accessibility" standard set forth in Title II's regulations provides:

> [N]o qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

---

[5] Because Congress explicitly authorized the Attorney General to promulgate regulations under the ADA, see 42 U.S.C. § 12134(a), the regulations "must [be given] legislative and hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute," United States v. Morton, 467 U.S. 822, 834 (1984).

28 C.F.R. § 35.149. A public entity must make its service, program, or activity "when viewed in its entirety," "readily accessible to and usable by individuals with disabilities," id. § 35.150(a), except where compliance would result in a "fundamental alteration" or an "undue burden," id. § 35.150(a)(3) (stating that the public entity has the burden of proving that compliance would require a "fundamental alteration" or "undue burden"). A public entity must "give priority to those methods that offer services, programs, and activities . . . in the most integrated setting appropriate." Id. § 34.150(b)(1). The public entity must also provide notice to individuals with disabilities of the "protections against discrimination assured them," id. § 35.106, and "disseminate sufficient information" to those individuals "to inform them of the rights and protections afforded by the ADA," 56 Fed. Reg. 35694, 35702 (1991). All together, "the program access requirement of title II should enable individuals with disabilities to participate in and benefit from the services, programs, or activities of public entities in all but the most unusual cases." Id. at 35708.

Addressing specifically access to an "existing facility," the regulations give a high priority to mobility for persons in wheelchairs. If "structural changes" are necessary

to achieve compliance, the regulations provide that "such changes shall be made within three years of January 26, 1992," 28 C.F.R. § 35.150(c), and an entity employing more than 50 persons must detail its planned structural changes in a "transition plan," id. § 35.150(d)(1). "If a public entity has responsibility or authority over streets, roads, or walkways, its transition plan shall include a schedule for providing curb ramps or other sloped areas where pedestrian walks cross curbs . . . ." Id. § 35.150(d)(2).[6] Congress emphasized in enacting the ADA that "[t]he employment, transportation, and public accommodations sections of [the ADA] would be meaningless if people who use wheelchairs were not afforded the opportunity to travel on and between the streets." H. Rep. No. 101-485 (1990), pt. 2, at 84.

Unlike Title III, however, which requires removal of architectural barriers whenever to do so would be "readily achievable," 28 C.F.R. § 36.304, a public entity "is not required to make structural changes in existing facilities where other methods are effective in achieving compliance," id. §

---

[6]     Title III's regulations similarly emphasize "installing ramps," and "making curb cuts in sidewalks and entrances." 28 C.F.R. § 36.304.

35.150(b)(1).[7]  If one facility is inaccessible, for example, a pubic entity can achieve compliance with the ADA by moving its services, programs, or activities to another facility that is accessible.  See United States Dep't of Justice, The Americans with Disabilities Act: Title II Technical Assistance Manual 10, 19 (1992).  Title II's emphasis on "program accessibility" rather than "facilities accessibility" was intended to ensure broad access to public services, while, at the same time, providing public entities with the flexibility to choose how best to make access available.  See Accessibility Under the ADA, at 53-54; 28 C.F.R. Part 35, App. A § 35.150  (stating that

---

[7]     By contrast, Title II's regulations governing "new construction and alterations" provide that "[n]ewly constructed or altered street level pedestrian walkways must contain curb ramps or other sloped areas at intersections to streets, roads, or highways." 28 C.F.R. § 35.151(e)(2).  In completing new construction or alterations, public entities may comply with one of two sets of technical accessibility standards: (1) the Uniform Federal Accessibility Standards (UFAS), promulgated under § 504 of the Rehabilitation Act, or (2) the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG), accompanying Title III.  See Accessibility Under the ADA, supra, at 87-88.  The ADAAG provides, for example, that any part of an access route with a slope greater than 1:20 "shall be considered a ramp," and such ramps "shall have level landings at the bottom and top."  See 28 C.F.R. pt. 36, App. A, at 4.8.  They further state that "Curb ramps" should be provided where access routes cross curbs, and "transitions from ramps to walks, gutters, or streets shall be flush and free from abrupt changes."  Id. at 4.7.  We focus in this case on the regulations governing existing structures because the Parkers presented no evidence that the path at issue was newly constructed or altered.

-13-

under Title II, "the concept of program access will continue to apply with respect to facilities now in existence, because the cost of retrofitting existing facilities is often prohibitive").

Pursuant to these requirements, the University was obligated to ensure that each service, program, or activity at the Botanical Gardens "when viewed in its entirety," was accessible to individuals with disabilities. One purpose of the Botanical Gardens is to serve as a venue for group events. The University holds open the Monet Garden as a place for group convocations, like the Girl Scouts awards ceremony that Parker attended. The University, therefore, has a duty to make the Monet Garden "readily accessible" to and "usable" by individuals with disabilities. Such access must be provided in the "most integrated setting appropriate," meaning that the University has an obligation to ensure that individuals with disabilities--such as persons using wheelchairs--can travel to and from the Monet Garden using safe walkways, ramps, and curb cuts. Although the University is not required to make every passageway in and out of the Monet Garden accessible, it must provide at least one route that a person in a wheelchair can use to reach the Monet Garden safely, absent a defense that excuses such performance.

## D.  The Parkers' Evidence

-14-

Although Parker could not say what caused his fall, and the Parkers presented no eyewitness account, Vázquez and Escudero testified that the fall occurred at the spot on the path where it dropped two inches abruptly to the ground below. A jury could infer that this dropoff caused Mr. Parker's wheelchair to overturn, or forced Parker to alter his course down the path in such a way that caused his fall. Wheelchairs do not typically overturn without some intervening cause.

A jury could also conclude that Parker was using the path intended for wheelchair use. A park guard directed Parker to use the path at issue, after seeing that Parker would be traveling by wheelchair. Although there were at least two other routes to the Monet Garden, there were no signs or other notices indicating that wheelchair users should take these other paths. Under these circumstances, a jury could conclude that the two-inch dropoff at the end of the paved path denied Parker safe access to the Monet Garden and caused his fall and injury.

In considering the defenses that the University could offer in response to this prima facie case, we first note that the claim under Title II is similar in many respects to a tort claim. See Pandazides v. Virginia Bd. of Educ., 13 F.3d 823, 829 (4th Cir. 1994) (stating that a private cause of action under § 504, "is essentially a form of statutory tort"); Wolsky

v. <u>Medical College of Hampton Roads</u>, 1 F.3d 222, 224 (4th Cir. 1993) ("Rehabilitation Act claims are injuries to individuals and analogous to personal injury claims."); <u>Smith</u> v. <u>Barton</u>, 914 F.2d 1330, 1337 (9th Cir. 1990) (noting that although there were no discrimination actions at common law, a discrimination action under the Rehabilitation Act "is most closely analogous to an 18th-century tort action or an action brought to enforce an express or implied employment contract").  In most instances, the injury alleged pursuant to Title II of the ADA is exclusion from participation in, or the denial of the benefits of the services, programs, or activities of a public entity, because of discrimination against a person by reason of disability.  <u>See, e.g.</u>, <u>Easley</u> v. <u>Snider</u>, 36 F.3d 297 (3d Cir. 1994) (seeking to enjoin state to include persons with certain types of mental disabilities in state home care program); <u>Kinney</u> v. <u>Yerusalim</u>, 9 F.3d 1067 (3d Cir. 1993) (seeking to enjoin municipality to install curb cuts as part of street resurfacing plan); <u>Concerned Parents to Save Dreher Park Ctr.</u> v. <u>City of West Palm Beach</u>, 846 F. Supp. 986 (S.D. Fla. 1994) (seeking to enjoin municipality from eliminating certain recreational programs for disabled persons).  Here, however, the injury alleged includes physical injury as well as the denial of access to a public facility.

Nevertheless, the inclusion of a physical injury in the Title II claim does not convert the claim into a traditional negligence action premised on the violation of a duty owed by a landowner such as the University to members of the public generally who are invited on to the premises. The primary injury alleged and proven under Title II in a case such as this remains the alleged violation by the University of its statutory duty to disabled persons to prevent the discriminatory denial of access to a service, program, or activity. The physical injury is an additional consequence of the violation of that statutory duty, which is of a different character than a duty owed to the general population. That is, the University does not satisfy the duties imposed by Title II merely by exercising reasonable care to protect persons with disabilities, along with other members of the public, from dangerous conditions on the premises. Rather, the University must act affirmatively to eliminate barriers on the premises that would otherwise serve to deny persons with disabilities access to services, programs, or activities of the University--here, access to the Monet Garden.

Given that the liability issue under Title II is a discriminatory denial of access, not negligence, the University could rebut the prima facie case of the Parkers by showing that

disabled persons using wheelchairs were not denied access to the Monet Garden.  For example, the University could have produced evidence that, irrespective of the accident on this occasion, the path at issue was actually safe for wheelchair use, thereby suggesting that the fall resulted from Mr. Parker's own negligence rather than a denial of access to disabled persons. The University might have established that there was another path to the Monet Garden that was safe for wheelchair use, properly noted with signs, but Parker and Vázquez missed the signs and misconstrued the signal of the park guard.  Finally, the University could have argued that providing wheelchair access to the Monet Garden would require a "fundamental alteration" or "undue burden."

These defenses were never offered because the trial court never required the defendants to defend.  That ruling was erroneous and it requires us to vacate and remand.

**IV.**

As we noted earlier, there were two important legal issues relevant to this lawsuit that were never raised by the parties below or on appeal.  We raise them here to avoid any suggestion that our decision implies a resolution of these issues.  We express no opinion on the merits.

Although Title II does not expressly authorize a private cause of action, it adopts the remedial scheme of Title VI of the Civil Rights Act of 1964, under which there is an implied private cause of action. See Guardians, 463 U.S. at 594-95. However, "the question of what remedies are available under a statute that provides a private right of action is 'analytically distinct' from the issue of whether such a right exists in the first place." Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 65066 (1992). Neither the Supreme Court nor this circuit has decided whether compensatory damages (other than backpay) are available under § 504 of the Rehabilitation Act or Title II. See Consolidated Rail Corp. v. Darrone, 465 U.S. 624, 630-31, 631 n.9, 637 (1984).[8] The defendants, however, have failed to contest the availability of compensatory damages under Title II, either before the district court or on appeal. They have waived the right to raise that issue as a defense during the retrial. cf. United States v. Barnett, 989 F.2d 546, 554 (1st Cir. 1993) ("[A] litigant has an obligation to spell out his arguments squarely and distinctly, or else forever hold his peace.").

---

[8] A plaintiff may sue under § 504, and hence also under Title II, for discriminatory treatment in employment, and, in that context, might seek backpay. See Consolidated Rail, 465 U.S. at 630.

We also note that the University may have an Eleventh Amendment sovereign immunity defense.  See University of Alabama at Birmingham Bd. of Trustees v. Garrett, 120 S. Ct. 1669 (April 17, 2000) (granting certiorari to address whether states have Eleventh Amendment immunity from claims brought under the ADA); Kimel v. Florida Bd. of Regents, 120 S. Ct. 631 (2000) (holding that Congress lacks power to abrogate state sovereign immunity under the Age Discrimination in Employment Act).  However, the University did not raise the defense in the trial court, has not argued it on appeal, and we decline to address it sua sponte. See Wisconsin Dep't of Corrections v. Schacht, 524 U.S. 381, 388 (1998) ("Unless the State raises [sovereign immunity], a court can ignore it.").

We leave to the district court the question of whether sovereign immunity can be raised in subsequent proceedings.  If the University asserts this defense, the district court would then have to determine several questions, including whether the assertion was timely, cf. Edelman v. Jordan, 414 U.S. 651 (1974) (noting that sovereign immunity can be raised for the first time in the Court of Appeals), and whether the state effectively waived the defense through the University's appearance in the first trial, cf. Sosna v. Iowa, 419 U.S. 393, 396 n.2 (1975) (noting that question of whether state waives sovereign immunity

-20-

"by entering a voluntary appearance and defending a suit on the merits" is one of state law); <u>Justino</u> v. <u>Zayas</u>, 875 F.2d 986, 993 (1st Cir. 1989) (noting that waiver by appearance is not readily assumed).  Finally, the court would have to consider whether the University of Puerto Rico is an arm of the Commonwealth for purposes of Eleventh Amendment immunity.  <u>See</u> 13 Wright & Miller, <u>Federal Practice and Procedure</u> § 3524, at 145, 160-62 (1984) (noting that most state universities are "considered arms of the state and therefore immune").

**Vacated and remanded to the district court for further proceedings consistent with this decision.**