**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 28 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

MANDY CHAFFIN; TIFFANY
NICKEL; CECIL STINBRINK,

    Plaintiffs - Appellees,

v.

KANSAS STATE FAIR BOARD;
BILL OGG, as General Manager of the
Kansas State Fair; BOB BARKER;
MARY ALICE LAIR; MARC
JOHNSON; CHARLES CRAIG, JR.;
KELLY GOSS; CAROLE JORDAN;
KENT OLEEN; BRAD RAYL;
ROBBA MORAN; GARY SHERRER;
TRACY TAYLOR, in their official
capacities as members of the Kansas
State Fair Board; STATE OF
KANSAS,

    Defendants - Appellants.

No. 02-3410

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 01-CV-1110-JTM)**

---

David P. Calvert, David P. Calvert, P.A., Wichita, Kansas, for Plaintiffs -
Appellees.

Harry Kennedy (and Hsingkan Chiang, Assistant Attorney General, with him on
the briefs), Attorney General's Office, Topeka, Kansas, for Defendants -
Appellants.

Before **KELLY**, **McKAY**, and **LUCERO**, Circuit Judges.

**KELLY**, Circuit Judge.

Plaintiff-Appellees are disabled persons who have attended the Kansas State Fair in the past, and who plan to attend future fairs. They alleged intentional discrimination and violation of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12134, by Defendants-Appellants the State of Kansas, the Kansas State Fair Board, its members, and the general manager of the fair. Plaintiffs sought injunctive relief against the Kansas State Fair for alleged failure to comply with the ADA and various of the federal regulations promulgated thereunder, including the Americans with Disabilities Act Accessibility Guidelines (ADAAG), 28 C.F.R. pt. 36, app. A.

On cross motions for summary judgment, the district court granted the Plaintiffs' motion for partial summary judgment directing all of the Defendants except the State of Kansas (hereinafter the Fair) to prepare a self-evaluation and a transition plan pursuant to 28 C.F.R. §§ 35.105 and 35.150. See U.S. Dep't of Justice, ADA Title II Technical Assistance Manual §§ II-8.200 to .300, http://www.usdoj.gov/crt/ada/taman2.html. Defendants appeal from the district court's order of November 1, 2002. We affirm.

<u>Background</u>

A.     Plaintiffs' Experiences at the Kansas State Fair

All of the plaintiffs rely on wheelchairs for mobility. II Aplt. App. at 410, 438-39, 463. On September 16, 2000, Plaintiff Mandy Chaffin went to the Kansas State Fair to attend a concert at the Grandstand, and was seated in the designated wheelchair section of the facility–a platform at the front of the Grandstand on which all persons in wheelchairs are placed. <u>Id.</u> at 416. Chaffin states that she could not see anything on the stage because the people who stood in front of her blocked her view. <u>Id.</u> Although security guards at the concert, upon Chaffin's request, told the people standing in front of Chaffin to sit down, once the security guards walked off, these people would stand up again. <u>Id.</u>

Chaffin also states that she soiled herself at the concert because she could not reach the restroom in time because of the overly-crowded wheelchair seating in the handicapped section of the Grandstand. <u>Id.</u> at 421. In order for a wheelchair patron to reach the restroom, many of the other wheelchairs between the platform and the restroom would have to be moved. None of those people were permitted to return to their spaces until the person who had gone to the bathroom returned. <u>Id.</u> at 416.

Plaintiff Tiffany Nickel has had problems with the parking at the State Fair. According to Nickel, the free parking lot where she was directed to park was far

away from the fair and contained potholes. As a result, she chose to pay to park in a closer but unpaved parking lot. Id. at 444-49.

Plaintiff Cecil Stinbrink alleges that he was seated in the Grandstand handicapped section where he was climbed over, stepped on, and bumped into by other attendees. Id. at 467-68. Because of the crowd sitting in the wheelchair section of the Grandstand, he could not get out of the section for food or use the restrooms until the shows were over. Id. Additionally, Stinbrink states that he was denied access to the restroom because he relies on his wife's assistance, and there is no unisex restroom available at the Grandstand. Id. at 468. Stinbrink also complains that the free parking provided by the State Fair was either too far from his point of interest at the fairgrounds, or too difficult to use due to its swampy conditions. Id. at 477-78.

B.     The State Fair and the ADA

On April 1, 1994, the Fair submitted a "draft" self-evaluation plan, pursuant to 28 C.F.R. § 35.105, for one of its fifteen programs ("Space Sales") to Jane Knight, the Kansas State ADA Coordinator. Aplee. Supp. App. at 547-65. Although Knight noted in her response "I look forward to receiving the entire Plan when it is completed," id. at 567, there is no evidence that any ADA self-evaluation plan for the remaining programs was ever performed.

There is evidence, however, of various other purported self-evaluation and

transition studies performed by the Fair. In 1997, an ADA compliance study of buildings and restrooms on the State Fairgrounds was conducted by Architects and Engineering Consultants, a professional consulting company located in Kansas. I-A Aplt. App. at 102-13. A memorandum report containing measurements was generated and submitted for advisory input to the Hutchinson Resource Center for Independent Living (HRCIL) on behalf of the State Fair Board.

Between February and April 1998, Architects and Engineering Consultants, with assistance from the Fair and HRCIL, conducted a survey on behalf of the State Fair regarding fire safety and ADA compliance of buildings and sites where the Fair provides its public services and programs. A report and cost summary was subsequently compiled by senior staff of the Kansas State Fair in April 1998. Id. at 114-48. The report's purpose was to "identify and provide cost estimates for solutions to fire safety and ADA deficiencies in buildings owned/managed by the Kansas State Fair." Id. at 115.

In September 1999, the Fair completed its "Long-Range Master Plan." Id. at 149-58. The Master Plan identifies and schedules major renovations to be completed. The Master Plan includes–within a list of eighteen bulleted "major recommendations"–"[c]omply[ing] with all building and site ADA and code requirements." Id. at 150. There is no other mention of the ADA in the ten-page

document.  Particular improvements under the ADA are not otherwise mentioned in the Master Plan, nor does the plan include any specific recommendations for improving access at the Fair for persons with disabilities.

In 2000, the Fair completed a review regarding Kansas State Fair Grandstand life safety, egress, fire protection, and ADA-related accessibility issues.  A report resulted from this review, known as the "Life Safety, Egress, Fire Protection and Accessibility Analysis for the Kansas State Fair Grandstand," which contained a single page of findings regarding the physical characteristics of the handicapped seating area.  Id. at 167.  The report contained recommendations and cost estimates for each of the suggested improvements.  Id. at 169-73.  Among the mostly non-accessibility-related modifications proposed in the report, it also called for a new ramp for the existing handicapped section, additional wheelchair seating at the box seating area, and minor modifications to the restrooms at the Grandstand.  Id. at 169-73.

On April 29, 2002, the State Fair completed its "Additional ADA Transition Plan."  I-B Aplt. App. at 193-326.  This plan compiled the previous studies in a single package, and proposed renovation and structure modification schedules for parking facilities and the Grandstand at the State Fairgrounds.  It provided schematic drawings for the parking systems and Grandstand projects with completion dates for the same.

The district court also identified numerous deficiencies at Fair facilities, including twenty-five buildings or areas that did not comply with ADA standards. I-A Aplt. App. at 29. For example, in the Administration Building, the following deficiencies exist: the Board room restrooms, the public restroom, and the first aid restroom are not ADA compliant; the east entry to the board room, main entry doors, west ramp, counter top, drinking fountain, and ticket window are not compliant; there is no handicap access from the east sidewalk; and the Highway Patrol office does not have handicap facilities.

In addition, the district court found that many of the vending and dining facilities at the Fair are not readily accessible. Id. at 37-38. The plan for modifications to the grandstand does not meet ADAAG standards, which require dispersed seating for persons in wheelchairs. Id. at 37. There are still twenty-two public restrooms on the Fairgrounds that do not comply with the accessibility requirements of the ADA, compared to twelve that do. Id. at 29. Moreover, even after the completion of the Kansas State Fair Master plan, scheduled for either 2006 or 2008, there will still be approximately sixteen public restrooms that do not comply.

C.    The District Court's Decision

In a Memorandum and Order filed November 1, 2002, the district court held that Plaintiffs are entitled to bring an action to enforce the various federal

regulations enacted under the ADA against all Defendants excluding the State of Kansas. The court further granted relief sought by Plaintiffs and ordered the Defendants to complete a self-evaluation and transition plan in compliance with 28 C.F.R. §§ 35.105 and 35.150 and submit the same to the court on or before January 1, 2003.

Defendants assert that the district court erred in (1) refusing to apply Alexander v. Sandoval, 532 U.S. 275 (2001) to preclude Plaintiffs from asserting a private right to enforce the ADAAG and other federal regulations; (2) applying an improper legal standard to determine compliance under the ADAAG; (3) holding that Defendants have not completed a self-evaluation and a transition plan as required by 28 C.F.R. §§ 35.105 and 35.150; and (4) denying Defendants' Eleventh Amendment immunity under an improper application of Ex Parte Young, 209 U.S. 123 (1908).

Discussion

We have jurisdiction over the district court's granting of an injunction against the Fair under 28 U.S.C. § 1292(a)(1), which confers appellate jurisdiction to hear "[i]nterlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions." In addition, we have jurisdiction over the Fair's appeal from the denial of

Eleventh Amendment immunity under the collateral order doctrine. P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144-45 (1993).

A.      Enforcement of Title II Implementing Regulations

Defendants' first argument is that the Plaintiffs' attempts to enforce the ADAAG and other federal regulations are precluded by Alexander v. Sandoval, 532 U.S. 275 (2001).  In Sandoval, the Supreme Court held that Title VI of the Civil Rights Act of 1964 does not imply a right of action for private litigants to sue recipients of federal funds for "disparate impact" violations.  Id. at 293.  The plaintiffs in Sandoval challenged the Alabama Department of Public Safety's official policy of administering its driver's licence examination only in English as having a discriminatory effect on minorities.  Recognizing that Title VI only reaches acts of intentional discrimination, see Alexander v. Choate, 469 U.S. 287, 293 (1985), the plaintiffs claimed that the implementing regulations, as opposed to the statute, created a private right of action for disparate impact violations.  The Court rejected that claim, basing its analysis not on the regulation's text but on the statute's text.  Sandoval, 532 U.S. at 293.  The Court held that only Congress by statute can create a private right of action.  Id. at 291.

In reaching its decision, the Supreme Court stressed that legislative intent is the only basis upon which a private right of action may be inferred:

> The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a

private remedy. Statutory intent on this latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.

Id. at 286-87.

The Court noted that "[l]anguage in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." Id. at 291. "[I]t is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself." Id.

Properly construed, Sandoval holds only that regulations may not create a private cause of action where no such right was intended by Congress in the statute authorizing promulgation of such regulations.

The Defendants argue that Plaintiffs only seek to bring this action to enforce the ADAAG and other regulations, not the ADA. According to the Defendants, the regulations prescribe conduct not required by the ADA itself. They cite to 42 U.S.C. § 12132, which states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

The Fair states that as long as Plaintiffs had "access" to the State

Fairgrounds and programs and services at the Kansas State Fair, they could not have been "excluded from" or "denied the benefits of" the Fair. We reject the argument that the ADA requires no more than mere physical access. Instead, we have held that the ADA requires public entitles to provide disabled individuals "<u>meaningful</u> access" to their programs and services. <u>Patton v. TIC United Corp.</u>, 77 F.3d 1235, 1246 (10th Cir. 1996) (emphasis added); <u>see also</u> <u>Randolph v. Rodgers</u>, 170 F.3d 850, 858 (8th Cir. 1999) (holding that although deaf inmate could physically attend prison activities, he did not have "meaningful access" without a sign language interpreter). As the Supreme Court has explained, "to assure meaningful access, reasonable accommodations in the [public entity's] program or benefit may have to be made." <u>Alexander v. Choate</u>, 469 U.S. 287, 301 (1985) (discussing requirement of the Rehabilitation Act, which also applies to the ADA through <u>Bragdon v. Abbott</u>, 524 U.S. 624, 631 (1998)). We therefore do not agree with Defendants that mere physical presence on the fairgrounds–at least when coupled with being effectively trapped in a handicapped section, unable to leave for food or to use the restroom, unable to view the stage, and subjected to being climbed over, stepped on, and bumped into by other attendees–amounts to anything other than a denial of the benefits of the fair.

The Fair also argues that even if it fails to meet the ADAAG and regulatory requirements, it cannot be "discriminating" against the plaintiffs because no

private right of action exists under the regulations. According to the Fair, this is because the ADA itself does not require the Fair to (1) initiate self-evaluations or adopt transition plans; (2) undertake a structural modification at the Grandstand to provide more than one hundred handicap and companion seating spaces; (3) provide paved parking and paths of travel at the Fair's parking lots; (4) maintain handicap restrooms; and (5) observe seating capacities. Thus, because the regulations required the Fair to do <u>more</u> than what the ADA itself required, and the ADA does not specifically confer a private right of action to enforce the regulations, <u>Sandoval</u> precludes Plaintiffs' suit.

The Fair misinterprets <u>Sandoval</u>. Although the Court held there was no right of action to enforce regulations regarding disparate impact discrimination that went beyond the substantive provisions of § 601 of the statute, the Court reaffirmed that the regulations applying the ban on <u>intentional</u> discrimination came within the private right of action to enforce the statute:

> We do not doubt that regulations applying § 601's ban on intentional discrimination are covered by the cause of action to enforce that section. Such regulations, if valid and reasonable, authoritatively construe the statute itself, see <u>NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.</u>, 513 U.S. 251, 257 (1995); <u>Chevron USA, Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 843-44 (1984), and it is therefore meaningless to talk about a separate cause of action to enforce the regulations apart from the statute. A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well.

<u>Sandoval</u>, 532 U.S. at 284.

Thus, the Supreme Court found that the private right of action contained in § 601 included a right to vindicate violations of the regulations implementing § 601's ban on intentional discrimination because the regulations simply interpreted and implemented the statute and did not substantively expand it. See Peters v. Jenney, 327 F.3d 307, 316-17 (4th Cir. 2003).

The same is true with the statutory provision and regulations at issue here. The regulations simply provide the details necessary to implement the statutory right created by § 12132 of the ADA. They do not prohibit otherwise permissible conduct. See, e.g., Parker v. Universidad de P.R., 225 F.3d 1, 5 (1st Cir. 2000) ("The language of Title II does not elaborate on the obligation of a public entity to an individual with a disability in the provision of 'services, programs, or activities.' We must rely for specifics on the regulations promulgated under Title II.").

A look at the findings made by Congress in enacting the ADA confirms the conclusion that Congress prohibited a broad, comprehensive concept of discrimination, beyond discrimination motivated by a hostile discriminatory purpose. Congress enacted the ADA with the goal of assuring "equality of opportunity, full participation, independent living, and economic self-sufficiency for [individuals with disabilities]." 42 U.S.C. § 12101(a)(8). Congress noted that individuals with disabilities tend to be "isolate[d] and segregate[d]," id. §

12101(a)(2), specifically identifying "segregation" as a form of discrimination, id. § 12101(a)(5). Other forms of discrimination include the discriminatory effects of architectural barriers and transportation barriers; failure to make modifications to existing facilities and practices; and relegation to lesser services, programs, activities, benefits, and other opportunities. Id. It is also noteworthy that Congress intentionally chose "not to list all the types of actions that are included within the term 'discrimination' [under Title II], as was done in titles I and III, because [Title II] essentially simply extends the anti-discrimination prohibition embodied in section 504 [of the Rehabilitation Act, which prohibits discrimination against the disabled by recipients of federal funding] to all actions of state and local governments." H.R. Rep. No. 101-485, pt. 2, at 84 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 367. It is therefore clear that the type of discrimination prohibited in the ADAAG falls squarely within the type prohibited by the ADA itself.[1]

The Fair further contends that the district court erred "in holding that Title VI of the Civil Rights Act has no direct effect on litigation under the ADA." Aplt. Br. at 28. Citing Barnes v. Gorman, 536 U.S. 181 (2002), the Fair claims

_____

[1]Because we find that the regulations at issue in this case are an authoritative and reasonable interpretation of Title II of the ADA, we need not look to legislative intent to determine whether Congress intended to create a private remedy to enforce the regulations. See Sandoval, 532 U.S. at 286.

- 14 -

that because the proper remedies available to a plaintiff for a violation of the ADA are "coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964," id. at 185, then if there is no private right of action for disparate impact under Title VI, the same is true under the ADA. Aplt. Br. at 28-29.

Section 12133 sets out the remedies available to those injured by a violation of the antidiscrimination provision of Title II. The Section adopts the same remedies, procedures, and rights of the Rehabilitation Act, 29 U.S.C. § 794a, for Title II violations. 42 U.S.C. § 12133. The Rehabilitation Act, in turn, adopts the same remedies, procedures, and rights available under Title VI of the Civil Rights Act of 1964. 29 U.S.C. § 794a(a)(2).

Although the interrelation between Title VI, the Rehabilitation Act, and the ADA was relevant in determining the narrow question in Barnes of whether punitive damages could be awarded in private suits brought against public entities under the ADA and the Rehabilitation Act, the Supreme Court has warned that "too facile an assimilation of Title VI law to § 504 must be resisted." Alexander v. Choate, 469 U.S. 287, 293 n.7 (1985). The defendants in Choate argued that because Title VI reached only instances of intentional discrimination, that Section 504 of the Rehabilitation Act only reaches purposeful discrimination against the handicapped. Id. at 292-93 & n.8 (citing Guardians Ass'n v. Civil Serv. Comm'n

of New York City, 463 U.S. 582, 607-08, 612, 634 (1983). In rejecting this claim, the Court noted that "[d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference–of benign neglect." Id. at 295; see also id. at 294 n.11 (noting that Section 504 was passed when "Congress was well aware of the intent/impact issue and of the fact that similar language in Title VI had been interpreted to reach disparate-impact discrimination").

We therefore hold that, although the conduct regulated by Title VI of the Civil Rights Act of 1964 is limited to intentional discrimination, see Sandoval, 532 U.S. at 280, Congress sought with § 504–and consequently with Title II of the ADA–to remedy a broad, comprehensive concept of discrimination against individuals with disabilities, including disparate impact discrimination.

B.    ADAAG Compliance

The Fair next argues that it is already in compliance with the ADA, and therefore strict compliance with the ADAAG is not required.

Under the ADA regulations,[2] a public entity, with respect to existing

---

[2]We note that because Congress explicitly authorized the Attorney General to promulgate regulations under the ADA, 42 U.S.C. § 12134(a), the regulations "must [be given] legislative and hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute." United States v. Morton, 467 U.S. 822, 834 (1984); see also Parker v. Universidad de P.R., 225 F.3d 1, 1 n.5 (1st Cir. 2000).

facilities, "shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and useable by individuals with disabilities." 28 C.F.R. § 35.150(a). This requirement does not "[n]ecessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities." Id. § 35.150(a)(1). Nor does it require a public entity to take any action that would result in a fundamental alteration or an undue burden. Id. § 35.150(a)(3).

Moreover, a public entity "is not required to make structural changes in existing facilities where other methods are effective in achieving compliance." Id. § 35.150(b)(1). "Title II's emphasis on 'program accessibility' rather than 'facilities accessibility' was intended to ensure broad access to public services, while, at the same time, providing public entities with the flexibility to choose how to make access available." Parker, 225 F.3d at 6.

On the other hand, if other methods are not effective in achieving compliance with program accessibility, then alterations must be made that comply with the accessibility requirements of § 35.151, see 28 C.F.R. § 35.150(b)(1), and a "transition plan" must be developed that sets forth the steps necessary to complete the changes, id. § 35.150(d)(1). Under 28 C.F.R. § 35.151(b), the facility "shall, to the maximum extent feasible, be altered in such a manner that the altered portion of the facility is readily accessible to and usable by individuals

- 17 -

with disabilities." The alteration must either meet the Uniform Federal Accessibility Standards (UFAS), 41 C.F.R. pt. 101-19.6, app. A, or the ADAAG, or use other methods "when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided." 28 C.F.R. § 35.151(c). The ADAAG itself permits departures from its guidelines only "where the alternative designs and technologies used will provide substantially equivalent or greater access to and usability of the facility." 28 C.F.R. pt. 36, app. A, § 2.2.

The key question in determining whether the Fair must comply with the ADAAG regulations and perform a transition plan is whether it is currently in compliance with the ADA, and if not, what changes will have to be made. As noted above, because the Fairgrounds were constructed prior to January 26, 1992, the effective date of the ADA, they need only meet the "program accessibility" standard for existing facilities. We must therefore determine whether the Fairgrounds, when viewed in their entirety, are readily accessible to and usable by individuals with disabilities. 28 C.F.R. § 35.150. We conclude that they are not.

The district court relied on the following uncontroverted facts concerning the Grandstand: the upper level seating is not wheelchair accessible; the second floor is not accessible; the second floor concessions, restrooms, and drinking fountains are not accessible; the stage is not accessible; there is inadequate seating for the disabled; and there is inadequate ADA signage. I-A Aplt. App. at

29 (Order citing Pls.' Resp. Defs.' Mot. Summ. J., Uncontro. Fact ¶ 68, found at Aplee. Supp. App. at 818). In addition, 22 public restrooms throughout the fairgrounds are not handicap accessible, id. (Uncontro. Fact ¶ 92, found at Aplee. Supp. App. at 839); and many buildings simply are not accessible by handicapped people at all, including the Old Mill and the Dairy Barn, id. (Uncontro. Fact ¶ 81, found at Aplee. Supp. App. at 838).

We agree with the Fair that, when determining the compliance of existing facilities with the ADA under program accessibility, courts must "look at the accessibility of the facilities as a whole, not at individual elements." Aplt. Br. at 33 (quoting Ass'n of Disabled Ams. v. City of Orlando, 153 F. Supp. 2d 1310, 1320 (M.D. Fla. 2001)). However, even under the less stringent program accessibility standard, the facilities as a whole must be "readily accessible." 28 C.F.R. § 35.150(a) (emphasis added). A violation of Title II "does not occur only when a disabled person is completely prevented from enjoying a service, program, or activity. . . . If a [facility's] wheelchair ramps are so steep that they impede a disabled person or if its bathrooms are unfit for the use of a disabled person, then it cannot be said that the [facility] is 'readily accessible.'" Shotz v. Cates, 256 F.3d 1077, 1080 (11th Cir. 2001). In this case, the "individual elements" that are not handicap accessible add up to a wholesale exclusion of disabled individuals from buildings, restrooms, dining areas, and seating areas across the entire

fairgrounds. We therefore agree with the district court that the Kansas State Fair, when viewed in its entirety and based on uncontroverted facts, is not readily accessible to and usable by individuals with disabilities.

The Fair has shown by its failure to accommodate disabled individuals, despite its efforts to redesign and renovate its existing facilities, that no methods are effective in achieving program accessibility other than making structural changes. In fact, the Fair has already begun to make structural changes to parts of the Grandstand. Aplt. Br. at 16-17. Because the Fair must make these alterations to its existing facility, it must comply with the accessibility requirements stated in 28 C.F.R. § 35.151. As noted above, § 35.151 requires that the public entity, in making alterations to existing facilities, comply with either the ADAAG or the UFAS, or else provide clearly equivalent access to the altered facility.

C.     Mootness

As a public entity covered by Title II, the fair must prepare a self-evaluation plan in accordance with 28 C.F.R. § 35.105. In addition, as mentioned above, because the Defendants must make alterations to their facility in order to comply with Title II's program accessibility requirement, they must prepare a transition plan in accordance with 28 C.F.R. § 35.150(d)(3). Defendants claim that they have already prepared a self-evaluation plan and a transition plan, and thus Plaintiffs' request for an injunction was moot. We disagree, because the

Fair's purported plans fall well short of the regulatory requirements.

Whether the Fair complied with the self-evaluation and transition plan requirements of the Title II regulations is a question of law. Tyler v. City of Manhattan, 849 F. Supp. 1429, 1435 (D. Kan 1994).

Under the Title II regulations, a public entity must, within one year of January 26, 1992 (the effective date of the regulations) "evaluate its current services, policies, and practices, and the effects thereof, that do not or may not meet the requirements of this part and, to the extent modification of any such services, policies, and practices is required, the public entity shall proceed to make the necessary modifications." 28 C.F.R. § 35.105(a). In addition, the public entity must allow interested persons to comment, id. § 35.105(b), and if the public entity employs fifty or more people, it must maintain on file for three years after the self-evaluation a list of the interested persons consulted, a description of areas examined and problems identified, and a description of any modifications made, id. § 35.105(c).

Thus, the self-evaluation requirement of § 35.105(a) involves two steps. First, the public entity must identify all of its programs, activities, and services. U.S. Dep't of Justice, ADA Title II Technical Assistance Manual § II-8.200, http://www.usdoj.gov/crt/ada/taman2.html. Second, it must review all of the policies and practices that govern the administration of its programs, activities,

and services.  Id.  Self-evaluations encompass all of a public entity's services, policies, and practices, not just existing physical facilities.  In that sense, self-evaluations are broader in scope than transition plans.  See Tyler v. City of Manhattan, 857 F. Supp. 800, 814 (D. Kan. 1994).

The second step requires the public entity to analyze whether the public entity's policies and practices adversely affect the full participation of individuals with disabilities in the program.  The Department of Justice's Title II Technical Assistance Manual suggests that the following areas, inter alia, require "careful attention" in a public entity's self-evaluation plan: whether any physical barriers exist; whether any policies and practices limit the participation of individuals with disabilities; whether communications with individuals with disabilities are as effective as communications with others; whether there are procedures to evacuate individuals with disabilities during an emergency; whether there are provisions for readers, interpreters, and other communication measures; and whether measures have been taken to ensure that employees are familiar with the policies ensuring the full participation of individuals with disabilities.  U.S. Dep't of Justice, ADA Title II Technical Assistance Manual § II-8.200.

The Fair points to four documents that it says meet the self-evaluation requirements of 28 C.F.R. § 35.105: (1) the 1998 ADA survey conducted by Architects and Engineers Consultants; (2) the 1999 "Long-Range Master Plan;"

(3) the 2000 "Life Safety, Egress, Fire Protection and Accessibility Analysis for the Kansas State Fair Grandstand;" and (4) the 2002 "Additional ADA Transition Plan." None of these reports, either individually or collectively, satisfies the requirements in the regulation.

The 1998 ADA survey, which conveniently doubled as a fire safety survey, did nothing more than list certain ADA structural deficiencies and provide cost estimates for modifications. The survey simply failed to address the Fair's "current services, policies, and practices, and the effects thereof" that do not meet the ADA. 28 C.F.R. § 35.105(a).

Moreover, there is no evidence that the Fair involved any interested persons to submit comments on the self-evaluation process when the 1998 report was being prepared. Although the report indicates that the Hutchinson Center for Independent Living assisted in the preparation of the survey, the record does not indicate who that organization is. More importantly, the requirement that a public entity provide an opportunity for interested persons to submit comments serves a valuable function: to ensure that the public officials responsible for conducting the self-evaluation will benefit from the input of the community of persons with disabilities, who are in the best position to identify problems with the entity's services, policies, and practices that limit their participation. 28 C.F.R. pt. 35, app. A, § 35.105. A simple cursory review of the self-evaluation by a single

organization can hardly achieve this objective.

To say that the Fair's 1999 Long-Range Master Plan "enhances the agency's compliance with 28 C.F.R. § 35.105," Aplt. Br. at 45, turns the self-evaluation requirement of Title II on its head. The Master Plan, I-A Aplt. App. at 149-58, is a ten-page document that mentions the ADA only once in a single sentence. The rest of the Master Plan is devoted to unrelated renovations to the Fairgrounds, such as creating "theme" visitor gates, an "Ethnic Village," and an "Icon Court." Needless to say, the Master Plan does not discuss how the Fair's services, policies, or practices need to be modified to conform to ADA requirements.

The 2000 report, "Life Safety, Egress, Fire Protection and Accessibility Analysis for: Kansas State Fair Grandstand," I-A Aplt. App. at 159-82, similarly fails to qualify as a self-evaluation under Title II. First of all, the study ignores the accessibility issues for the entire Fairgrounds except for the Grandstand. Although (in the single page devoted to "Accessibility Analysis") the report discussed the structural conditions that cause ADA deficiencies in the Grandstand, and made some general recommendations therefor, I-A Aplt. App. at 167, it did not address the structural conditions elsewhere in the Fairgrounds, or the "services, policies, and practices" throughout the facility that do not comply with the ADA. There is also no evidence that interested persons were given an

opportunity to comment on this report.

Finally, the Fair points to the 2002 "Additional ADA Transition Plan." I-B Aplt. App. at 193-326. This document, which merely compiles the Fair's previous purported self-evaluation plans under a single cover, was properly characterized by the district court as "defendants' careful attempt to recast various proposals and studies from the previous decade as some kind of integrated ADA self-evaluation or transition plan . . . [that is] simply an after-the-fact, eleventh-hour attempt to re-package a hodge-podge of earlier, isolated proposals." I-A Aplt. App. at 33 (Memorandum and Order). The Plan, like the individual studies that make up the whole, simply fails to meet the requirements of a self-evaluation under the Title II regulations.

Nor has the Fair satisfied the requirements for transition plans under 28 C.F.R. § 35.150(d). The Title II regulations require that in the event structural changes to facilities are to be undertaken to achieve program accessibility, a public entity employing fifty or more persons must complete, within six months of January 26, 1992, a transition plan setting forth the steps necessary to complete the changes. Id. An opportunity to participate in the development of the transition plan must be provided to all interested persons, and a copy of the transition plan made available for public inspection.

The transition plan must, at a minimum:

(i)     Identify physical obstacles in the public entity's facilities that limit the accessibility of its programs or activities to individuals with disabilities;

(ii)    Describe in detail the methods that will be used to make the facilities accessible;

(iii)   Specify the schedule for taking the steps necessary to achieve compliance with this section and, if the time period of the transition plan is longer than one year, identify steps that will be taken during each year of the transition period; and

(iv)    Indicate the official responsible for implementation of the plan.

Id. § 30.150(d)(3).

The Fair claims that both its "Life Safety, Egress, Fire Protection and Accessibility Analysis for: Kansas State Fair Grandstand" and its "Additional ADA Transition Plan" served as transition plans for the Fairgrounds. Because the Life Safety study is one of the earlier proposals repackaged in the Additional ADA Transition Plan, our discussion of the latter will encompass the former.

The Fair's purported transition plans fail to meet the minimum requirements of the Title II implementing regulations. First, none of the documents included in the Additional ADA Transition Plan identifies the physical obstacles in the Fairgrounds, but only indicates generally the parts of the listed facilities that need to be modified. For example, regarding the Administration Building, the study states simply, "Board room restrooms not compliant," "Counter top does not comply," and "Ticket window not compliant." I-B Aplt. App. at 224. In addition, many of the facilities at the Fairgrounds appear never to have been evaluated at all, including the Eisenhower Building, the Poultry

Building, the Plant Science Building, and the Dairy Barn.

Nor does the Additional ADA Transition Plan describe "in detail" the methods that will be used to make the facilities accessible. Throughout the Plan, the Fair points to physical barriers, but provides no solution to making the facilities accessible. See, e.g., id. at 258 (stating that both restrooms in the Horse Exhibition Building are non-accessible, but not indicating how they are non-accessible, or how they can be made accessible). When proposals are specified for making the facilities accessible, they are vague and unhelpful. For example, regarding the Administration Building again, the proposed methods in the Plan include such solutions as "Modify existing countertop at administration area" and "Modify ticket window." Id. at 224. The proposed methods to be used in making the Fairgrounds accessible contained in the Additional ADA Transition Plan thus fall woefully short of the detail required by the Title II implementing regulations.

Additionally, although it is clear that the duration of the Fair's transition plan for achieving compliance exceeds one year, the plan fails to identify the steps to be taken during each year of the transition plan, as required by § 35.150(d)(3)(iii). The closest the Fair comes to satisfying this requirement is in the "Summary Review of ADA related Improvements and Projects, 1991–2006" contained in the Additional ADA Transition Plan. I-B Aplt App. at 308-324. But even here, the Fair describes future projects only in the barest of terms. For

example, projects scheduled for 2005 include "Building Enhancements," "Site Improvements," and "Paving and Roads." The Fair's failure to identify the steps to be taken in each year of the transition plan is only compounded by their failure to describe in detail the modifications that need to be made to make the Fairgrounds accessible, thereby keeping us all in the dark as to what improvements need to be made, and when the Fair will make them. Without at least indicating <u>which</u> buildings, sites, and roads are scheduled for improvements, and <u>what</u> those improvements will entail, the Fair has done little more than ask us to trust them to make the Fairgrounds accessible. This we are not able to do.

The Additional ADA Transition Plan also fails to indicate the official, whether by name or by title, who is responsible for the implementation of the plan as required by 28 C.F.R. § 35.150(d)(iv). The plan merely designates three representatives from the Kansas State Fair as "contacts." I-B Aplt. App. at 194.

We remind the Fair of the requirement that in preparing the transition plan, like the self-evaluation, a public entity is required to allow interested persons, including individuals with disabilities and their representatives, to participate in the development of the transition plan by submitting comments. Many individuals with disabilities have unique perspectives on a public entity's programs, activities, and services. For example, individuals with mobility impairments can readily identify barriers preventing their full enjoyment of the public entity's

programs, activities, and services.

On a final note about Defendants' mootness arguments, we note that pursuant to the regulations, the Fair should have performed its self evaluation and transition plans over ten years ago. The Fair's "Additional ADA Transition Plan," however, was not compiled until April 29, 2002–two weeks _after_ summary judgment papers were filed. In such a case, we are hesitant to declare the matter moot, which would allow Defendants to evade judicial review. City News & Novelty, Inc. v. City of Waukesha, 531 U.S. 278, 284 n.1 (2001). "When defendants are shown to have settled into a continuing practice . . . , courts will not assume that it has been abandoned without clear proof. It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." United States v. W.T. Grant Co., 345 U.S. 629, 632 n.5 (1953) (quotation omitted).

D. Sovereign Immunity

The Fair argues that as agents of a sovereignty, they are immune from this suit under the Eleventh Amendment. The Eleventh Amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S.

Const. amend. XI.

This court reviews de novo the district court's denial of a state's claim to Eleventh Amendment immunity. Lewis v. N.M. Dep't of Health, 261 F.3d 970, 975 (10th Cir. 2001).

The Eleventh Amendment guarantees that "nonconsenting States may not be sued by private individuals in federal court." Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001); see also Alden v. Maine, 527 U.S. 706, 713 (1999) ("[A]s the Constitution's structure, and its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution and which they retain today.").

Although States are generally immune from suit brought by private individuals, there are three well-established exceptions to the bar. First, the States may consent to suit, waiving their immunity. See Alden, 527 U.S. at 755. Second, "Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority." Garrett, 531 U.S. at 363 (quotation omitted). Finally, under the doctrine announced in Ex parte Young, 209 U.S. 123 (1908), an individual seeking only prospective injunctive relief for ongoing violations of federal law may bring suit against state officials in federal courts. See Alden, 527

U.S. at 757; Seminole Tribe v. Florida, 517 U.S. 44, 74 (1996). The reasoning behind the Ex parte Young exception is that if an official has performed his duties in a way that contravenes either the Constitution or a federal law, he does so outside the cloak of state authority. Because a suit against that official therefore does not impact "the State in its sovereign or governmental capacity," Eleventh Amendment immunity is inapplicable. 209 U.S. at 159.

We agree with the Fair that Title II of the ADA was not a valid abrogation of the States' Eleventh Amendment immunity. See Thompson v. Colorado, 278 F.3d 1020, 1034 (10th Cir. 2001). The Fair also asserts that the Ex parte Young exception does not apply. We disagree.

In determining whether the Ex parte Young doctrine governs a case, we apply a four-part framework:

> First, we determine whether the action is against state officials or the state itself. Second, we look at whether the alleged conduct of the state officials constitutes a violation of federal law. Third, we assess whether the relief sought is permissible prospective relief or analogous to a retroactive award of damages impacting the state treasury. Finally, we analyze whether the suit rises to the level of implicating "special sovereignty interests."

Robinson v. Kansas, 295 F.3d 1183, 1191 (10th Cir. 2002) (citations omitted).

Applying the facts of this case to the doctrine of Ex parte Young renders an easy conclusion. First, this case is without question against state officials acting in their official capacity. Although plaintiffs' Third Amended Complaint contained a claim against the State of Kansas, that claim has been dismissed and

- 31 -

the plaintiffs have not appealed. The remaining defendants, comprised of the General Manager of the Kansas State Fair and Members of the Kansas State Fair Board, are state officers sued in their official capacities.

Second, the alleged conduct constitutes a violation of Title II of the ADA. This appears to be the prong that the Fair challenges, as they claim that Ex parte Young does not apply to this case because the Fair has already been complying with the ADA. Aplt. Br. at 52. First of all, this appears to be simply a rehashing of the Fair's flawed construction of the ADA, discussed above. More fundamentally, however, this prong of our Ex parte Young analysis does not require us to ascertain whether state officials actually violated federal law. See Elephant Butte Irrigation Dist. of N.M. v. Dep't of Interior, 160 F.3d 602, 610 (10th Cir. 1998). The Supreme Court has ruled that we only need to determine whether Plaintiffs state a non-frivolous, substantial claim for relief against the State officers that does not merely allege a violation of federal law "solely for the purpose of obtaining jurisdiction." Larson v. Domestic & Foreign Comm. Corp., 337 U.S. 682, 690 n.10 (1949).

Third, it is quite clear that plaintiffs seek prospective equitable relief: an injunction requiring the Fair to complete a self-evaluation and a transition plan. The Fair, oddly, disputes even this prong, claiming that "Plaintiffs seek an act of mandamus, i.e., an order compelling the performance of an act mandated by law,

rather than an injunction." Aplt. Br. at 53. The Fair misinterprets the requirement for prospective equitable relief. The requirement is not a game in semantics; rather, the "overriding question is . . . whether the relief will remedy future rather than past wrongs." Elephant Butte, 160 F.3d at 611 (quotation omitted). As the Fair concedes that "Plaintiffs wish . . . to require Defendants to take additional steps in the future," we see this prong as easily satisfied. Aplt. Br. at 53.

Finally, Plaintiffs' suit does not implicate special sovereignty interests, nor has the Fair so claimed. Cf. ANR Pipeline Co. v. Lafaver, 150 F.3d 1178, 1193-94 (10th Cir. 1998) (holding that States possess a special sovereignty interest in their tax collection systems). We therefore find that under the doctrine of Ex parte Young, Plaintiffs' suit does not implicate Eleventh Amendment immunity.

AFFIRMED