Marvin HUEZO, Plaintiff,

v.

LOS ANGELES COMMUNITY COLLEGE DISTRICT (Re: Los Angeles Pierce College); Does 1 through 20, Inclusive, Defendants.

Case No. CV 04–9772 MMM (JWJx).

United States District Court, C.D. California.

Sept. 9, 2008.

Paul L. Rein, Patricia Barbosa, Julie McLean, Law Offices of Paul L. Rein, Oakland, CA, Jordon Metz, Goodman and Metz, Encino, CA, Julie A. Ostil, Law Office of Julie A. Ostil, San Ramon, CA, Patricia Barbosa, Barbosa Group, Huntington Beach, CA, for Plaintiff.

Camille A. Goulet, Rae Fallon Pidoux, Los Angeles Community College District General Counsel, Eric C. Kim, Office of General Consel, Los Angeles, CA, Conrad Kohrs, Kohrs & Fiske, Richard E. Morton, Haight Brown and Bonesteel, Santa Ana, CA, for Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION

MARGARET M. MORROW, District Judge.

### I. FACTUAL & PROCEDURAL BACKGROUND

On December 1, 2004, plaintiff Marvin Huezo filed this action against the Los Angeles Community College District ("the District") and certain unnamed defendants. Huezo requires the use of a wheelchair or other mobility devices to attend classes and gain access to public facilities at Pierce College, a state community college located in the San Fernando Valley. Huezo alleged that defendants failed to make the educational facilities accessible to mobility-impaired persons and failed to provide "programs, services and activities" in a non-discriminatory manner to persons with mobility disabilities. On August 16, 2005, after the court granted the District's motion to dismiss his initial complaint, Huezo filed a first amended complaint alleging two causes of action under Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

On December 18, 2006, Huezo moved for partial summary judgment. He argued that the undisputed facts showed he was entitled to judgment as a matter of law on his claim that the District discriminated against him by reason of his disability, leaving only his request for compensatory damages to be adjudicated at a subsequent stage of these proceedings.[1]

---

1. Liability under the ADA and § 504 can be established without a showing of discriminatory intent. See *Crowder v. Kitagawa*, 81 F.3d 1480, 1483–84 (9th Cir.1996); see also, e.g., *Tyler v. City of Manhattan*, 857 F.Supp. 800, 817 (D.Kan.1994) ("The prohibition of Title II applies to action that carries a discriminatory effect, regardless of the City's motive or intent," citing *Concerned Parents to Save Dreher Park Center v. City of West Palm Beach*, 853 F.Supp. 424, 424–26 (S.D.Fla.1994)). To recover compensatory damages, however, intentional discrimination must be proven. See, e.g., *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir.2001); *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir.1998).

On February 27, 2007, the court granted Huezo's motion, finding that there were no triable issues of fact, and that as a matter of law, the District had violated the ADA and § 504 of the Rehabilitation Act by excluding Huezo from participation in and denying him the benefits of its services, programs, and activities, or otherwise discriminating against him on the basis of his disability.[2] The court also determined that the District had also failed to operate its educational programs, services, and activities at Pierce College in a manner that was "readily accessible to and usable by" students with mobility impairments commencing in the Fall semester of 2003 and continuing to the date of the court's order.[3]

Following entry of the order granting Huezo's motion for partial summary judgment, the court referred the parties to Magistrate Judge Jeffrey Johnson for a settlement conference on April 27, 2007. With Judge Johnson's assistance, the parties reached an agreement on Huezo's claims for damages and attorney's fees; they also undertook to work together to resolve injunctive relief issues. Huezo represents the District advised him that it had planned a massive renovation of the Pierce campus, and that barriers to access would be removed as part of the renova-

tion.[4] Huezo's counsel agreed to work with the District to coordinate barrier removal and modify school policies.[5]

On May 9, 2008, Huezo filed a motion for permanent injunctive relief, requesting that the court enjoin the District to comply with Title II of the ADA.[6] Huezo contends that, despite more than a year of negotiation, the District has never given him definitive information regarding the scope or timing of the planned renovations. Nor, he asserts, has it responded to his demand for injunctive relief to complete the settlement.[7] Huezo maintains that he continues to encounter multiple barriers on a daily basis at the Pierce campus, and therefore has no option but to seek an order requiring the District to remove barriers and change discriminatory policies.[8]

## II. DISCUSSION

### A. Standard Governing Motions for Permanent Injunctive Relief

"The requirements for the issuance of a permanent injunction are (1) the likelihood of substantial and immediate irreparable injury; and (2) the inadequacy of remedies at law." *Dream Palace v. County of Maricopa*, 384 F.3d 990, 1010 (9th Cir.2004) (citing *G.C. & K.B. Investments, Inc. v. Wilson*, 326 F.3d 1096, 1107 (9th Cir.

2. February 27, 2007 Order Granting Plaintiff's Motion for Partial Summary Judgment ("February 27, 2007 Order") at 30.

3. *Id.* The court incorporates its factual findings from its order on the motion for summary judgment into this order, and, where relevant, will discuss those findings *infra* in greater detail.

4. Plaintiff's Motion for Permanent Injunctive Relief ("Pl.'s Mot.") at 7.

5. *Id.* at 7–8.

6. *Id.* at 8.

7. *Id.*

8. *Id.* Specifically, Huezo seeks an order requiring the District to (1) prepare a compliant self-evaluation and transition plan; and (2) pending completion of a plan, to take certain steps and remove certain barriers on an interim basis to make Pierce's programs readily accessible. The interim changes Huezo seeks to have the court mandate include modification of certain policies and procedures, appointment of an interim ADA coordinator, and modification of registration and services for disabled students. (*Id.* at 12–22). Huezo requests that any permanent injunction include a monitoring program to ensure that the District completes the work necessary to operate Pierce as "readily accessible." (*Id.* at 23).

2003)); see also *Sierra Club v. Penfold*, 857 F.2d 1307, 1318 (9th Cir.1988) ("The basis for injunctive relief is irreparable injury and inadequacy of legal remedies. This requires a court to balance the competing claims of injury and the effect on each party of granting or withholding of the requested relief," citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)); *Na Pali Haweo Community Ass'n v. Grande*, CV 04–00413 DAE/BMK, 2008 WL 763695, *5 (D.Haw. Mar. 20, 2008) (" 'The requirements for the issuance of a permanent injunction are the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law,' " quoting *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1495 (9th Cir.1996)).

A court may issue a preliminary injunction if plaintiff demonstrates " 'either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor.' " *Lands Council v. Martin*, 479 F.3d 636, 639 (9th Cir.2007) (quoting *Clear Channel Outdoor Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir.2003)); see also *Miller v. Cal. Pacific Med. Ctr.*, 19 F.3d 449, 456 (9th Cir.1994). "The standard for granting a permanent injunction is essentially the same as a preliminary injunction with the exception that the plaintiff must show … actual success, instead of probable success on the merits." *Walsh v. City and County of Honolulu*, 460 F.Supp.2d 1207, 1211 (D.Haw.2006) (citing *Amoco Prod. Co.*, 480 U.S. at 546 n. 12, 107 S.Ct. 1396).

## B. Whether Plaintiff Has Shown Actual Success on the Merits

### 1. Legal Standard Governing ADA and Rehabilitation Act Claims

In his first and second causes of action, Huezo alleged claims for violation of Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[9] Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation

---

**9.** The rights and responsibilities created by the ADA and the Rehabilitation Act are nearly identical; the two statutes are, for the most part, distinguished by the fact that the Rehabilitation Act applies only to entities that receive public funding. See *Washington v. Indiana High School Athletic Ass'n*, 181 F.3d 840, 845 n. 6 (7th Cir.1999). Indeed, "the standards applicable to one act are applicable to the other." *Id.*; see also *Theriault v. Flynn*, 162 F.3d 46, 48 n. 3 (1st Cir.1998) (noting that "Title II of the ADA was expressly modeled after Section 504 of the Rehabilitation Act, and is to be interpreted consistently with that provision"). The legislative history of the ADA makes apparent the substantial overlap between the rights and responsibilities created by the ADA and the Rehabilitation Act. See H.R.Rep. No. 101–485(II) (House Report on Pub.L. No. 101–336, American with Disabilities Act of 1990), reprinted in 1990 U.S.C.C.A.N. 303, 367 (May 15, 1990) ("Section 202 of the legislation extends the nondiscrimination policy in section 504 of the Rehabilitation Act of 1973 to cover all State and local governmental entities. Specifically, section 202 provides that no qualified individual with a disability shall, by reason of such disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination by a department, agency, special purpose district, or other instrumentality of a State or a local government. The Committee has chosen not to list all the types of actions that are included within the term 'discrimination', as was done in titles I and III, because this title essentially simply extends the anti-discrimination prohibition embodied in section 504 to all actions of state and local governments"); see also *Collings v. Longview Fibre Co.*, 63 F.3d 828, 832 n. 3 (9th Cir.1995) ("The legislative history of the ADA indicates that Congress intended judicial interpretation of the Rehabilitation Act be incorporated by reference when interpreting the ADA").

in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, § 504 of the Rehabilitation Act, as amended,[10] provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

To establish a violation of Title II of the ADA, a plaintiff must show that "(1)[ ]he is a qualified individual with a disability; (2)[ ]he was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities, and (3) such exclusion or discrimination was by reason of [his] disability." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir.2002) (citing *Weinreich v. Los Angeles County Metropolitan Transportation Authority*, 114 F.3d 976, 978 (9th Cir.1997)). To establish a violation of § 504 of the Rehabilitation Act, a plaintiff must show that "(1)[ ]he is [disabled] within the meaning of the [Rehabilitation Act]; (2)[ ]he is otherwise qualified for the benefit or services sought; (3)[ ]he was denied the benefit or services solely by reason of her handicap; and (4) the program providing the benefit or services receives federal financial assistance." *Smith*, 914 F.2d at 1338.[11]

To achieve Congress's broadly remedial purpose of "provid[ing] a national mandate for the elimination of discrimination against the disabled," *Wood v. County of Alameda*, 875 F.Supp. 659, 665 (N.D.Cal. 1995),[12] the United States Attorney General has promulgated regulations requiring each public entity subject to the ADA to conduct a "self-evaluation." The regulations state:

"(a) A public entity shall, within one year of the effective date of this part, evaluate its current services, policies, and practices, and the effects thereof, that do not or may not meet the requirements of this part and, to the extent modification of any such services, policies, and practices is required, the public entity shall proceed to make the necessary modifications.

(b) A public entity shall provide an opportunity to interested persons, including individuals with disabilities or organizations representing individuals with disabilities, to participate in the self-evaluation process by submitting comments.

---

**10.** A 1992 amendment substituted the word "disability" for the word "Handicap," which was used in § 504 of the Rehabilitation Act of 1973. See Rehabilitation Act Amendment of 1992, Pub.L. No. 102–569, 106 Stat. 4360; see also *Gates v. Rowland*, 39 F.3d 1439, 1445 n. 1 (9th Cir.1994). Section 794a of the Act provides a private right of action for violations of § 794. See 29 U.S.C. § 794a; see also *Smith v. Barton*, 914 F.2d 1330, 1338 (9th Cir.1990).

**11.** In opposing Huezo's motion for partial summary judgment, defendant did not dispute that he is a qualified individual with a disability or that the District receives federal financial assistance, subjecting it to the requirements of the Rehabilitation Act.

**12.** See also H.R.Rep. No. 101–485(II), reprinted in 1990 U.S.C.C.A.N. at 332 ("[T]here is a compelling need to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities and for the integration of persons with disabilities into the economic and social mainstream of American life. Further, there is a need to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities. Finally, there is a need to ensure that the Federal Government plays a central role in enforcing these standards on behalf of individuals with disabilities").

(c) A public entity that employs 50 or more persons shall, for at least three years following completion of the self-evaluation, maintain on file and make available for public inspection:

(1) A list of the interested persons consulted;

(2) A description of areas examined and any problems identified;

(3) A description of any modifications made." 28 C.F.R. § 35.105(a)-(c).[13]

If, following self-evaluation, the public entity determined that it was necessary to make "structural changes to facilities" to "achieve program accessibility,"[14] the entity was required to develop a "transition plan setting forth the steps necessary to complete such changes." *Id.* § 35.150(d)(1); see also 34 C.F.R. § 104.22(e) (parallel regulatory provision for the Rehabilitation Act). The transition plan was, "at a minimum," required to "(i)[i]dentify physical obstacles in the public entity's facilities that limit the accessibility of its programs or activities to individuals with disabilities; (ii)[d]escribe in detail the methods that will be used to make the facilities accessible; (iii)[s]pecify the schedule for taking the steps necessary to achieve compliance with this section and, if the time period of the transition plan is longer than one year, identify steps that will be taken during each year of the transition period; and (iv)[i]ndicate the official responsible for implementation of the plan." 28 C.F.R. § 35.150(d)(3); see also 34 C.F.R. § 104.22(e) (parallel regulatory provision for the Rehabilitation Act). The transition plan was to be developed after soliciting input from interested individuals, and a copy of the plan was to be made publicly available. 28 C.F.R. § 35.150(d)(1); 34 C.F.R. § 104.22(e) (parallel regulatory provision for the Rehabilitation Act).

## 2. The Court's Findings in its Order Granting Partial Summary Judgment

As noted, in its order granting Huezo's motion for partial summary judgment, the court concluded Huezo had shown that the District had violated the ADA and § 504 of the Rehabilitation Act by excluding Huezo from participation in and denying him the benefits of its services, programs, and activities, or otherwise discriminating against him on the basis of his disability. In particular, the court found, based on undisputed, admissible evidence, that defendant failed to comply with ADA and Rehabilitation Act provisions requiring that it evaluate its programs, services and facilities, and prepare a transition plan.[15] The court also found that Huezo had identified myriad correctable yet unameliorated physical barriers on the Pierce College campus.[16]

---

**13.** A parallel self-evaluation was implicitly required, but not expressly mandated, by the regulations implementing the Rehabilitation Act. Recognizing this fact, the ADA regulations also provide: "If a public entity has already complied with the self-evaluation requirement of a regulation implementing section 504 of the Rehabilitation Act of 1973, then the requirements of this section shall apply only to those policies and practices that were not included in the previous self-evaluation." 28 C.F.R. § 35.105(d).

**14.** As the ADA regulations make clear, structural changes to facilities are not mandated if a public entity can guarantee disabled individuals ready access to each of its services, programs, and activities through alternative means, e.g., "redesign[ing] . . . equipment, reassign[ing] . . . services to accessible buildings, assign[ing] . . . aides to beneficiaries, [providing] home visits, deliver[ing] . . . services at alternate accessible sites, . . . construct[ing] . . . new facilities, us[ing] . . . accessible rolling stock or other conveyances, or any other methods." *Id.*, § 35.150(b)(1); see also 34 C.F.R. § 104.22(b) (parallel regulatory provision of the Rehabilitation Act).

**15.** February 27, 2007 Order at 22.

**16.** *Id.* at 28–29.

It was undisputed that, although the ADA placed the burden on the District to make its services and facilities accessible to disabled students, Huezo had had to request accommodations from the school in order to surmount barriers on campus.

## C. Scope of the Injunction

■ Because the court granted Huezo's motion for partial summary judgment on his ADA and Rehabilitation Act claims, Huezo has shown actual success on the merits. See *Disability Law Center of AK, Inc. v. North Star Behavior Health,* CV 07–62 JWS, 2008 WL 853639, *2 & n. 12 (D.Alaska Mar. 27, 2008) ("To succeed on a motion for a permanent injunction, DLCA must have actual success on the merits," citing *Sierra Club,* 857 F.2d at 1318 (noting that the "standard for a preliminary injunction is essentially the same as for a permanent injunction except 'likelihood of success on the merits rather than actual success' must be shown")); see also *Lonberg v. City of Riverside,* CV 97–237 SGL AJWx, 2007 WL 2005177, *7 (C.D.Cal. May 16, 2007) (*"Lonberg II"*) ("The ADA states that the remedies and procedures set forth in section 505 of the Rehabilitation Act are the remedies available to any person alleging discrimination under the ADA. 42 U.S.C. § 12133. Section 505 of the Rehabilitation Act, in turn, states that a person who is being discriminated against is entitled to injunctive relief. 29 U.S.C. § 794a"). Thus, the first prong of the showing necessary to secure permanent injunctive relief is satisfied. The court considers *infra* whether Huezo has shown a likelihood of irreparable injury, such as would entitle him to injunctive relief as a matter of law. Before doing so,

however, it addresses the scope of the injunctive relief Huezo seeks.

Huezo requests that the court enjoin the District "from continuing to discriminate against persons with disabilities by requiring [it] to evaluate all of the facilities and programs offered at Pierce College, ... to remove necessary barriers[,] and [to] modify its policies and procedures to ensure that Pierce is 'operating' its programs and services in a manner that is 'readily accessible and usable by' persons with mobility disabilities." [17] He asserts that without an enforceable court order requiring the District to comply with its obligations under Title II of the ADA, Huezo and other disabled persons will continue to be excluded from and denied the benefits of defendant's programs, services, and activities, including the use of safe and accessible parking, paths of travel on campus to reach classrooms, and accessible classrooms at Pierce College.[18] The District counters that injunctive relief is not necessary because "Pierce College has taken great strides to make its programs and services 'readily accessible and usable' by plaintiff and others." [19]

### 1. Self–Evaluation and Transition Plan

■ Huezo first argues that it is necessary to order the District to conduct a self-evaluation and create a transition plan because it continues to delay in completing these activities, and because self-evaluation and a transition plan are necessary to ensure modification of discriminatory policies and practices, and to provide information about the scope of barrier removal at Pierce College and the schedule for its completion.[20] The District responds that it

17. Pl.'s Mot. at 4.

18. *Id.*

19. Defendant Los Angeles Community College District's Opposition to Plaintiff's Motion for

Permanent Injunctive Relief ("Def.'s Opp.") at 3.

20. Pl.'s Mot. at 12.

contracted with ADA Accrediting Consulting on August 13, 2007, to assist in development of an ADA transition plan,[21] and that the plan that has been created identifies the barriers that must be removed, their location, the nature of the recommended corrections, the cost of the corrections, and the CBC/ADAAG Specification addressed.[22] In addition, the District states that Environmental Access, Inc. and ADA Accrediting and Consulting completed a Pierce College Self Evaluation on April 25, 2008.[23] Huezo asserts that the self-evaluation and transition plan do not comply with ADA regulations.[24]

As noted in the court's order granting partial summary judgment, some courts have held that a private plaintiff cannot sue to enforce the self-evaluation and transition plan regulations. See, e.g., *Iverson v. City Of Boston*, 452 F.3d 94, 102 (1st Cir.2006) (holding that the self-evaluation and transition plan regulations impose obligations on public entities that differ from those imposed by the ADA and thus that they cannot be enforced through the private right of action provided in Title II); *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 913–15 (6th Cir. 2004) (holding that "[a]lthough the development of a transition plan 'may ultimately facilitate compliance with Title II, ... there is no indication that a public entity's failure to develop a transition plan [seriously] harms disabled individuals," or that a public entity cannot make its services, programs, or activities accessible to qualified disabled persons without first develop-

ing a transition plan). At least one circuit, however, has taken the opposite view. See *Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 857–58 (10th Cir.2003) (holding that both the self-evaluation and transition plan regulations are enforceable in a private suit under the ADA).

In granting partial summary judgment, the court concluded that it did not need to address whether the self-evaluation and transition plan regulations were privately enforceable, and that it could consider defendant's compliance or lack of compliance with them as merely a factor in assessing Huezo's claims of discrimination. Although it determined that the District had failed to comply with the regulations requiring a self-evaluation and transition plan, the court noted that this did not necessarily prove that its services, programs, or activities were not accessible to qualified disabled persons. Rather, the court stated, the lack of a self-evaluation and transition plan was evidence that tended to show Huezo had suffered discrimination in the provision of defendant's services, programs, or activities. Because Huezo now asks the court to order that the District conduct a self-evaluation and prepare a transition plan, however, the court must determine whether there is a private right of action that permits a plaintiff like Huezo to obtain such relief.[25]

There is no controlling Ninth Circuit authority on this issue. In *Armstrong v. Davis*, 275 F.3d 849 (9th Cir.2001), the Ninth Circuit noted the district court's

---

**21.** Def.'s Opp. at 10; Declaration of Paul Nieman in Opposition to Plaintiff's Motion for Permanent Injunctive Relief ("Nieman Decl."), ¶ 6, Exh. G.

**22.** Def.'s Opp. at 10.

**23.** *Id.;* Nieman Decl., ¶ 7, Exh. F.

**24.** Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Permanent Injunctive Relief ("Pl.'s Reply") at 13–14.

**25.** The court notes that Huezo does not address whether there is a private right of action to enforce these regulations, and the parties thus have interdict a broader swath of conduct than provided no briefing on this issue.

findings that the State of California had not complied with the regulations mandating self-evaluation and preparation of a transition plan, and that it was not in substantial compliance with the ADA and Rehabilitation Act as a result. *See id.* at 858 and n. 14. Based on these and other findings, the district court certified a class and entered an injunction. The Ninth Circuit affirmed the award of injunctive relief, although it required some modification of the form of the injunction. *Id.* at 879. Because the court primarily addressed issues of standing, certification and the propriety of class-wide relief, however, it did not discuss whether proof of a failure to comply with the self-evaluation and transition plan regulations sufficed to prove discrimination under the ADA and/or Rehabilitation Act and whether the regulations were enforceable through a private right of action. Two district courts in the Ninth Circuit that have addressed the issue have agreed with the First and Sixth Circuits, and have held that "there is no private right of action to enforce either the self-evaluation or transition-plan requirements set forth in the federal regulations accompanying Title II of the ADA." See *Cherry v. City College of San Francisco*, No. C04–04981 WHA, 2005 WL 2620560, *2 (N.D.Cal. Oct. 14, 2005); *Californians for Disability Rights, Inc. v. California Dept. of Transp.*, 249 F.R.D. 334, 342 (N.D.Cal. 2008) ("[T]his Court concurs with its sister court's ruling in *Cherry*, and holds that there is no private right of action to enforce either the self-evaluation or transition plan regulations"); but see *Lonberg v. City of Riverside*, CV 97–237 RT AJWx, 2006 WL 4811345, *1 (C.D.Cal. May 4,

2006) (*"Lonberg I"*) ("This Court determines that the analysis and reasoning in *Chaffin* is more persuasive than the analysis and reasoning in *Ability Center*. It, therefore, concludes that Lonberg does have a private right of action under Section 12134 for injunctive relief compelling the City to comply with its obligations under Section 35.150(d)").

As noted by the court in *Californians for Disability Rights*, the Tenth Circuit in *Chaffin* held that there was a private right to enforce the regulations implementing Title II by examining the regulations collectively and concluding that, "as a whole, they 'simply provide the details necessary to implement the statutory right created by § 12132 of the ADA. They do not prohibit otherwise permissible conduct.'" *Californians for Disability Rights*, 249 F.R.D. at 341 (quoting *Chaffin*, 348 F.3d at 858). Other circuit courts have disagreed. In *Ability Center*, for example, "the Sixth Circuit held [that] no private right to enforcement existed under 28 C.F.R. 35.150(d), [because] 'failing to develop a transition plan . . . does not in and of itself . . . hinder the disabled.'" *Id.* at 341 (quoting *Ability Ctr.*, 385 F.3d at 914). Similarly, the First Circuit in *Iverson* "examined the self-evaluation regulation, § 35.105, and found that 'it is altogether conceivable that a public entity may be in full compliance with Title II without observing the commands of the self-evaluation regulation'. . . ." Consequently, it held, "a private right of action to enforce the self-evaluation regulation does not exist." *Id.* (quoting *Iverson*, 452 F.3d at 101).[26]

---

**26.** The *Californians for Disability Rights* court also noted that prior to *Iverson*, the district court in *Cherry* offered a similar reason for declining to find a private right of action to enforce the regulations. It reasoned that " 'there is no indication that a public entity's failure to develop a transition plan harms

disabled individuals, let alone in a way that Title II aims to prevent or redress,' and therefore no private right of action to enforce the transition plan regulation would lie." *Californians for Disability Rights*, 249 F.R.D. at 341 (quoting *Cherry*, 2005 WL 2620560 at *4).

All three circuits endeavored "to interpret the Supreme Court's guidance in *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001)." *Id.* at 341. "In characterizing the Supreme Court's holding in *Sandoval*, the First Circuit stated:

'[The Supreme Court recognized in *Sandoval* that] [a]n implementing regulation may under certain circumstances be enforced through the private right of action available under the organic statute that it implements. Under *Sandoval*, however, a private plaintiff may not, merely by referencing the organic statute, enforce regulations that interdict a broader swath of conduct than the statute itself prohibits. After all, the power to create a private right of action, like the power to create positive federal law itself, lies exclusively with Congress.' " *Id.* (quoting *Iverson*, 452 F.3d at 101).

"[R]ejecting the Tenth Circuit's analysis in *Chaffin*, the First Circuit ... reasoned:

'In our view, the *Chaffin* court misconstrued *Sandoval* and, thus, the decision is simply incorrect. Although the court appropriately recognized that "regulations may not create a private cause of action where no such right was intended by Congress in the statute authorizing promulgation of such regulations," [*Chaffin*, 348 F.3d at 857], it inexplicably disregarded *Sandoval*'s corollary rule that regulations which impose an obligation beyond the statutory mandate are not enforceable through the statutory right of action. In light of this error, we elect to align ourselves with the Sixth Circuit, see *Ability Ctr.*, 385 F.3d at 913–15, and to reject the position of the

Tenth Circuit, see *Chaffin*, 348 F.3d at 856–60.' " *Id.* (quoting *Iverson*, 452 F.3d at 101–02 (some internal citations omitted)).[27]

After reviewing the opinions, the *Californians for Disability Rights* court determined, consistent with the analysis of the First and Sixth Circuits, and of the district court in *Cherry*, that "*Sandoval* directs a regulation-by-regulation analysis, as opposed to the 'collective' approach endorsed by the Tenth Circuit, in order to determine if each [regulation] exhibits a Congressional intent to create a private right of enforcement." *Id.* at 342. The court reasoned that because "the transition plan and self-evaluation regulations might both be violated and yet there could still be no violation of Title II, ... Congress's intent to create a private right of enforcement for violations of Title ... II itself cannot be imputed to the accompanying regulations." *Id.* (citing *Cherry*, 2005 WL 2620560 at *4). Ultimately, the court concluded that "[s]ince neither regulation contains a clear Congressional intent to create a private right of enforcement, *Sandoval* mandates that none be found in the facts of this case." *Id.* Concurring with the holding in *Cherry*, it found "that there [was] no private right of action to enforce either the self-evaluation or transition plan regulations." *Id.*

The court agrees with the careful reasoning of those circuit and district courts that have concluded, under *Sandoval*, that there is no private right of action to enforce the self-evaluation and transition plan regulations. As Huezo has presented no argument to the contrary, the court

---

**27.** The *Californians for Disability Rights* court noted that this aspect of *Iverson*'s analysis "is [also] consonant with the reasoning employed by ... *Cherry*." *Californians for Disability Rights*, 249 F.R.D. at 342 (citing *Cherry*, 2005 WL 2620560 at *3 ("Unlike the Sixth Circuit, the Tenth Circuit did not engage in a separate analysis for each regulation in dispute ... This order agrees with the Sixth Circuit that there is a distinction between regulatory violations that, by themselves, would deny the disabled meaningful access to public services and those that would not")).

denies his request for an injunction requiring the District to prepare a self-evaluation and transition plan in accordance with ADA regulations.

### 2. Barriers to Access

Huezo notes that in granting partial summary judgment, the court found that he and other disabled students had "been excluded from participation in or otherwise discriminated against with regard to defendant's services, programs, or activities by reason of [their] disability." [28] He asserts that, while at Pierce College, he has encountered both physical barriers to access and barriers arising from Pierce's policies and procedures regarding disabled students. Huezo requests that the court order the District to remove these interim barriers until such time as it conducts a self-evaluation that complies with the regulations and implements a transition plan to remove barriers and modify policies and procedures. [29]

### a. Official Policies and Procedures

#### i. Interim ADA Coordinator

Huezo contends that Pierce relies completely on two educational counselors associated with the Disabled Students Programs & Services ("DSPS") to assist disabled students. [30] The court earlier found that DSPS did not respond adequately when Huezo complained of barriers and access problems. Furthermore, Huezo proffers evidence that the counselors are not trained in ADA requirements for accessible programs and services. [31] As a result, he contends, "there is no knowledgeable, responsible person to [whom a disabled student can] take complaints and [no one who can] coordinate a correct response [among] [Pierce] [f]acility staff, ... teaching faculty, and disabled students. [32] Huezo therefore requests that the District be ordered to hire an interim ADA coordinator with the experience necessary to modify Pierce's policies and practices in a way that will permit it to operate its educational programs in a "readily accessible" manner. [33]

The District responds that after settling the monetary damages issues in the case, Pierce appointed Sylvia Silva as its designated ADA coordinator. [34] Silva identifies herself as the "Pierce College Compliance Officer and current ADA Coordinator...." [35] She asserts that she became the ADA Coordinator, she has worked on creation of a Special Services Student Handbook and preparation and review of the Pierce Self Evaluation and Transition Plan. [36] Given Silva's appointment as ADA coordinator and the fact that Huezo does not appear to dispute Silva's qualifications to serve in such a position, the court finds that it is unnecessary to order the District to hire an interim ADA Coordinator.

28. Pl.'s Mot. at 17.

29. *Id.* at 16.

30. *Id.* at 17.

31. See Declaration of Patricia Barbosa in Support of Plaintiff's Motion for Permanent Injunctive Relief ("Barbosa Decl."), Exh. 3 (Deposition of Miriam Helena Gottlieb ("Gottlieb Depo.") at 133:1–135:5; Deposition of Leslie Donna Cook ("Cook Depo.") at 21:9–22:25).

32. Pl.'s Mot. at 17.

33. *Id.* at 17–18. Huezo contends that the coordinator would also be responsible for documenting requests for help or accommodation, and the resolution of such requests. (*Id.*).

34. Def.'s Opp. at 6–7.

35. Declaration of Sylvia Silva in Opposition to Plaintiff's Motion for Permanent Injunctive Relief ("Silva Decl."), ¶ 1.

36. *Id.*, ¶¶ 2–4.

### ii. Registration and Services for Disabled Students

Huezo argues that the District does not operate its programs in a readily accessible manner in part because it does not anticipate and respond to physical barriers or policies that discriminate against disabled students.[37] He contends that there are many physical barriers to access that directly affect him at Pierce College, including a lack of accessible parking, the need to ask for a special card to park in the teachers' lots, exterior paths of travel on campus that make it difficult or impossible for him to travel from the public street to his classes and between classes, and the lack of a handrail on a ramp where he fell more than two years ago.[38] Huezo continues to take a class in the Applied Tech Building; although there is now an accessible desk, he reports that there are still no curb cuts or accessible paths of travel to get to the class.[39]

In addition, Huezo now takes a night architecture class in the Music Building, which is located on the upper campus.[40] He asserts there is no accessible path of travel from the upper campus to accessible parking or any other part of campus.[41] As a result, Huezo has had to ask for a ride from DSPS, which has a van to take disabled students to inaccessible locations on campus.[42] Use of the van service has been problematic for Huezo. On one occasion, he was given a ride to class, but was told by Leslee Cook of DSPS that he would have to call his wife for pick-up because the DSPS office closed at 8:00 p.m.[43] Sub-

---

37. Pl.'s Mot. at 18.

38. *Id.*

39. *Id.*

40. *Id.*, ¶¶ 4, 6.

41. *Id.*, ¶¶ 4, 7. In support of his request for a permanent injunction, Huezo proffers the declaration of Karl Danz, a licensed contractor and specialist in universal/barrier-free design and construction. (Declaration of Karl Danz in Support of Plaintiff's Motion for Permanent Injunctive Relief ("Danz Decl.")). Danz worked with Huezo's retained expert, Peter Margen, to conduct site inspections, take photographs and measurements, and prepare exhibits that depict the barriers at Pierce College. (*Id.*, ¶ 2). Danz states that a long series of stairs connect the lower campus to the upper campus. (*Id.*, ¶ 7). There is no other pedestrian path of travel that provides access to the upper campus, except for very long street routes that surround the school. (*Id.*).

Defendant objects to Danz's declaration under Rule 37(c)(1) on the ground that Huezo failed to disclose Danz as an expert witness. (Defendant Los Angeles Community College District's Objections to Declaration of Karl Danz in Support of Plaintiff's Motion for Permanent Injunctive Relief ("Def.'s Objections") at 1). Defendant also contends that the Danz declaration is based on hearsay and lacks foundation. (*Id.* at 2).

The court need not consider the Danz declaration or address defendant's objection, as Huezo's statements regarding the accessibility of buildings on the upper campus are supported by the declaration of Peter Margen in support of Huezo's motion for partial summary judgment. (See Declaration of Peter Margen in Support of Plaintiff's Motion for Partial Summary Judgment ("Margen Decl.")). Margen, a qualified expert in ADA compliance, conducted a thorough inspection of the Pierce College campus to determine "the accessibility of certain public facilities ... and [ ] the impact of these accessibility conditions on the programmatic access of the programs, services, and activities offered at Pierce College, along with conditions related [to] parking and paths of travel." (*Id.*, ¶ 7). Margen states that the only way a wheelchair user can reach the Music Building is to go all the way around campus on Mason Street and Stadium Way. (*Id.*, ¶ 11). "These streets are very long, very steep and inaccessible." (*Id.*). Margen found that "there [was] no alternate *accessible* means for a mobility disabled student to walk or roll" to the Music Building. (*Id.*).

42. Huezo Decl., ¶ 7.

43. *Id.*

sequently, Huezo was told that DSPS had arranged for an employee to pick him up after class, but only on the days of class and only right before and after class.[44] Because DSPS will transport Huezo only at his scheduled class time, if Huezo wants to go to class early, stay late to meet with the professor or other students, or go to Music Building at other times of day to use a desk for drafting or studying, he has no way to get there.[45]

Beyond his difficulties in accessing the Music Building, Huezo has also found that there is no space or accessible desk for him to use there.[46] After the professor advised him to call DSPS to request accommodation, Huezo spoke with a DSPS counselor and asked for an accessible desk.[47] Leslee Cook assisted him, but said that he would have to re-register with DSPS to obtain help. Huezo did this.[48] By his second class, an accessible desk had been provided, but it had no bench of the type Huezo needs for his prosthetic legs, and it had been placed facing the wall.[49] To get the desk moved and obtain a bench, Huezo again had to contact DSPS, which then contacted a plant manager. The plant manager called Huezo and asked for a meeting in the classroom so that he could identify where Huezo wanted the desk located.[50] All told, it took more than a week to secure an accessible desk and bench located in the area where the remainder of the student desks were located.[51]

As respects his class in the Applied Tech Building, Huezo reports that DSPS expects him to drive to the class and find accessible parking next to the building because there are no curb cuts or accessible paths of travel for pedestrians to reach the building.[52] Although he has complained about the lack of accessible curb cuts and paths of travel since Fall of 2003, the District has not taken steps to make the building accessible.[53]

### (a) Huezo's Requests

In light of the continuing barriers to access at Pierce College, Huezo requests that the District be directed to modify its policies and procedures in various ways, including:

44. *Id.*

45. *Id.* The District does not dispute Huezo's representations regarding the availability of shuttle service at Pierce College. Leslee Cook, a counselor in Pierce's Special Services Department, states that Huezo and other similarly situated students "must fill out the appropriate forms with Special Services so that Pierce College is aware of the class schedule of the requesting student and [can] plan transportation accordingly." (Declaration of Leslee Cook ("Cook Decl."), ¶¶ 1, 3).

46. Huezo Decl., ¶ 6.

47. *Id.*

48. *Id.*

49. *Id.*

50. *Id.*

51. *Id.*

52. *Id.,* ¶ 7. Again, the Margen declaration supports Huezo's assertions concerning the Applied Tech Building. As with the Music Building, to reach the Applied Tech Building, a wheelchair user must travel all the way around campus on Mason Street or Stadium Way, streets that are long, steep, and inaccessible. (Margen Decl., ¶ 11). The paths of travel surrounding the Applied Tech Building lack curb cuts and/or curb ramps. (*Id.*). Margen states that "[s]tudents with mobility disabilities cannot use the sidewalks and must walk or roll in the narrow street with cars parked and traffic coming by, and they must also use the steep driveway to reach ... classes" in the Applied Tech Building. (*Id.*). Finally, there is only one accessible parking space for the building, so only one disabled student or teacher can park near it at a time. (*Id.*).

53. Huezo Decl., ¶ 7.

- That it be required to hire an individual with expertise in Title II and ADAAG regulations, particularly the use and placement of accessible equipment in schools,[54] to establish a written school-wide policy, and train Pierce facility staff, teachers, and DSPS counselors in the use and placement of accessible desks and equipment. Huezo also asks that the court direct that each teacher will be responsible for requesting accessible desks and equipment as necessary, and ensuring that such equipment is obtained, properly placed, and maintained in his or her classroom.[55]

- That it install accessible tables and desks in all classrooms currently in use;[56] that the accessible desks be bolted to the floor so they cannot be moved; and that they have priority signage.[57] He requests that the court direct that the accessible tables and desks be placed with other student desks, that they have required wheelchair space, and that they offer accessible ingress and egress. Huezo notes additionally that science, computer, and music and art classes may require special accessible equipment that must be ready for use when needed.[58]

- That defendant publish comprehensive information regarding the services and accommodations available for disabled students.[59] DSPS publishes a booklet that provides general information regarding the educational services offered to disabled students. Huezo asserts, however, that the Student Handbook does not provide information regarding special parking permits for the teachers' parking lots; keys for the library elevator; or the availability of shuttle services to take disabled students to inaccessible locations.[60] He contends that this information is not disseminated to disabled students unless they complain about the lack of access.[61] Huezo therefore requests that, until such time as the District removes barriers on campus, it be required to publicize the special accommodations available in the materials provided at the orientation for disabled students; on the school's website; and in the college newspaper.[62] Further, Huezo requests that the court enjoin the District from charging disabled students for obtaining parking permits for use of the teachers' parking lots, or a key to the library elevator.[63]

54. Pl's Mot. at 19.

55. Id.

56. Id.

57. Id. at 19–20.

58. Id. at 20. Huezo notes that in his motion for partial summary judgment, the court found that on occasion, he had been unable to participate in class activities or had been dissuaded from taking a class altogether due to the lack of accessible facilities. (See February 27, 2007 Order at 23–24 & n. 52). For instance, a lack of accessible desks discouraged Huezo from taking a cinema class in which he was interested, because he found that he would have to sit by himself in front of the class. In addition, the Life Sciences Building has fixed desks that are not accessible to Huezo, as they contain sinks and lab equipment he cannot reach. (Id. at 24 n. 52). The court determined that this and other evidence demonstrated that Huezo had not had the "high degree of convenient accessibility" to Pierce College campus facilities to which the ADA entitles him. (Id. at 24).

59. Pl.'s Mot. at 20.

60. Id.

61. Id.

62. Id.

63. Id.

● That the District provide regularly scheduled accessible shuttles for disabled students.[64] Huezo notes that DSPS provides van service only to the inaccessible upper campus, and not to the Applied Tech Building. Moreover, disabled students receive transportation assistance only when they specifically request it. Huezo asks that until such time as the District renovates the inaccessible paths of travel on campus, it provide a regularly scheduled wheelchair accessible shuttle that can take disabled students to all of the areas of campus that his expert has identified as lacking accessible paths of travel.[65] These include the upper campus, the agricultural and equestrian facilities, the applied technology buildings, and parking lots. Huezo asks that the court order that the service be widely publicized and that it have a regular schedule and marked stops.[66] He contends this method of transporting students is routinely used on college campuses and that it would provide a non-discriminatory service to many disabled students who do not feel comfortable asking a DSPS educational counselor to act as a driver.[67]

### (b) The District's Response

The District responds that after settling the monetary damages issues in the case, it endeavored to make as much progress as it could in resolving the issues raised in Huezo's complaint.[68] Robert Garber, the President of Pierce College, states that as a result of the mediation, the "mobility assistance" portion of the Special Services Student Handbook was revised,[69] and a list of off-campus resources for disabled stu-

64. *Id.* at 21.

65. *Id.*

66. *Id.* at 22.

67. *Id.* at 21–22.

68. Def.'s Opp. at 6. The District has submitted a declaration by Michael Gibbens, an expert accessibility/usability specialist, in support of its position that an injunction is not necessary. (See Declaration of Michael Gibbens in Opposition to Plaintiff's Motion for Permanent Injunctive Relief ("Gibbens Decl."), ¶ 2). Huezo objects to the declaration on the ground that the court excluded his testimony under Rule 37(c)(1) in a November 30, 2006 order denying defendant's ex parte application to continue the deadline for rebuttal expert disclosure and the expert discovery cutoff date, and in a December 12, 2006 denial of defendant's request for reconsideration. (Plaintiff's Opposition to Defendant's Submission of Declaration of Michael Gibbens ("Pl.'s Objections") at 1–2). Apparently anticipating this objection, the District argues that by submitting the declaration of Karl Danz, "a non-disclosed expert, plaintiff has no standing to object to the attached declaration of LACCD's expert consultant regarding ADA compliance, Michael Gibbens." (Def's Opp. at 4).
The court agrees with Huezo that the District's attempt to introduce Gibbens' previous-ly excluded expert testimony is improper. Because the court has already excluded Gibbens' testimony based on the District's failure to disclose him as an expert or otherwise comply with the expert discovery deadlines in the case, the court declines to consider his declaration in connection with the present motion for permanent injunction. See FED. R. CIV. PROC. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless"); cf. *Pratt v. California State Bd. of Pharmacy,* 268 Fed.Appx. 600, 603 (9th Cir.2008) (Unpub. Disp.) ("[T]he district court did not abuse its discretion in excluding the declaration of Dr. Poggio. Pratt never properly disclosed this expert or provided an expert report, nor did he seek an extension to do so," citing *Quevedo v. Trans-Pac. Shipping. Inc.,* 143 F.3d 1255, 1258 (9th Cir.1998)).

69. Def.'s Opp. at 6; Declaration of Robert Garber in Opposition to Plaintiff's Motion for Permanent Injunctive Relief ("Garber Decl."), ¶¶ 1, 4. Garber does not identify the revisions to the "mobility assistance" section that were made. The section states that wheelchairs and scooters are available to assist students in

dents was provided.[70] Appended to the handbook is a campus map identifying para-transit stops and disabled parking spots; a Los Angeles Community College District Disabled Student Program & Services Counseling Record; a Special Services Recommendation & Referral form; and a Pierce College Special Services Authorization to Release Information to Instructors form.[71] Garber states that the Special Services Student Handbook has been made available to all students who have requested it.[72]

The District also contends that consistent with discussions at the mediation, it has begun to conduct a training program for instructors at the start of each fall semester that includes two sessions on the ADA; additionally, it "train[s] on a case by case basis as matters come up from time to time."[73] Pierce College has created several ADA-compliant forms to ensure that it is aware of a student's request for accommodations.[74] These forms include the Pierce College Accommodations Request Form, Accommodations Update Form, and the Los Angeles Pierce College Special Services Program Authorization of Temporary Services.[75] To receive the ac-

commodations offered by Pierce College, each qualifying student must fill out the forms properly prior to the beginning of each semester.[76]

The District argues that these steps ensure that disabled students are able to benefit from the programs, services, and activities offered at Pierce College.[77] It maintains that the present methods it employs are effective in achieving compliance with the program access requirements of 28 C.F.R. § 35.150, which states that "[a] public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section."[78] 28 C.F.R. § 35.150(b)(1).

### (c) Court's Analysis

■ As noted in the court's order granting Huezo's motion for partial summary judgment, the access requirements of the ADA are set forth in 28 C.F.R. §§ 35.149–.151. Section 35.149 sets forth a general prohibition against discrimination; § 35.150 governs the accessibility of existing facilities; and § 35.151 governs the accessibility of new construction and alterations.[79] Section 35.150 requires that a

moving around Pierce College. (*Id.*, Exh. A). It also states that "[t]he Special Services program [ ] has an adapted full-size van equipped with a wheelchair lift to transport students using wheelchairs to and from the art, drama, and music buildings. For other mobility-impaired students, we will be using other forms of transportation. All requests for regularly-scheduled transportation services must be made at least a week before services begin. Last minute requests will be accommodated as best as possible." (*Id.*).

A section discussing services for mobility-impaired students addresses other concerns raised by Huezo, in that it states that students may obtain special parking and library elevator access. (*Id.*)

70. *Id.*, ¶ 4, Exh. A. The organizations identified include the Braille Institute, California State Department of Rehabilitation, California State University, Northridge, and the Office of Civil Rights. (*Id.*, Exh. A).

71. *Id.*

72. *Id.*, ¶ 4.

73. Def.'s Opp. at 7; Garber Decl., ¶ 6.

74. Def.'s Opp. at 7; Silva Decl., ¶ 4.

75. Silva Decl., ¶ 4, Exh. I.

76. *Id.*, ¶ 4.

77. Def.'s Opp. at 8.

78. *Id.*

79. There are parallel regulations implementing the Rehabilitation Act. See 34 C.F.R. §§ 104.21 (general prohibition against dis-

public entity "operate *each* service, program, or activity so that the service, program, or activity, *when viewed in its entirety,* is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a) (emphasis added). In deciding the motion for partial summary judgment, the court found that Huezo had established that he did not have the "high degree of convenient accessibility" to Pierce College campus facilities to which he is entitled under the ADA, given the difficulties he had encountered in obtaining accessible workstations and parking, and entering inaccessible classrooms.[80]

The court also noted that Huezo had proffered undisputed evidence that he had had to personally request accommodation to overcome barriers that exist on the Pierce College campus.[81] The court found that the District had improperly placed the burden of requesting accommodation and identifying on disabled students. It determined that the District's failure to take affirmative steps to ensure that its programs and facilities were operated so that they were readily accessible to disabled persons was discriminatory within the meaning of the ADA and the Rehabilitation Act.[82] See *Putnam v. Oakland Unified Sch. Dist.,* No. C–93–3772CW, 1995 WL 873734, *10 (N.D.Cal. June 9, 1995). As the *Putnam* court stated:

> "Defendants ... mistakenly argue that the regulations do not require entities to take any action to address architectural barriers creating the potential for denial of access, but instead allow entities to deal with problems when they 'actually arise,' either by then removing the barrier or by alternative means. However, the regulations impose upon schools the

affirmative duty continuously 'to operate each program ... so that the program ..., when viewed in its entirety, is readily accessible to handicapped persons.'

> "Although the regulations do not require removal of all architectural barriers to achieve such ready accessibility, they do require prompt implementation of a plan making all programs readily accessible. The approach of taking no action to render programs accessible until a student or parent identifies an accessibility problem does not make a program 'readily' accessible. Rather, this approach imposes the discriminatory requirement that a disabled student ascertain which barriers deny her access and brave possible disapproval to point them out and request that they be remedied. Furthermore, it imposes the further discrimination of forcing the student to wait for the barriers to be remedied, and in the meantime either be excluded or be subjected to the perils attendant to the barriers. Finally, Defendants' approach also has the discriminatory effect of discouraging students from entering or staying in the inaccessible school system, or from attempting to participate in classes and other programs located in inaccessible facilities." *Id.*

See also *Bacon v. City of Richmond,* 386 F.Supp.2d 700, 708 (E.D.Va.2005) ("The law does not require ... that Plaintiffs[ ] request some specific form of accommodation as a prerequisite to a valid ADA claim.... The ADA requires that any program or activity held at a school be made accessible to the handicap[ped]. The burden is not on the disabled to create accommodation solutions, but on those that pro-

---

crimination), 104.22 (accessibility of existing facilities and transition plan), 104.23 (accessibility of new construction).

**80.** See February 27, 2007 Order at 23–25.

**81.** *Id.* at 26.

**82.** *Id.* at 27–28.

vide services or facilities which hinder their participation").

Huezo has demonstrated that barriers resulting from the District's official policies and procedures persist, despite the changes the District has made following the parties' mediation. According to the Special Services Student Handbook, to obtain mobility assistance, a disabled student must (1) register with DSPS; (2) make an appointment with a Special Services counselor; (3) submit verification of disability; and (4) seek accommodation by requesting the loan of the wheelchair or scooter, or a van ride to an inaccessible part of campus, at least a week before the scheduled class.[83] The handbook states that (a) when disabled students need to park closer to a classroom, they must submit a medical doctor's certification that the service is required, and request a gate key from Special Services that will allow them to park in staff and faculty parking areas;[84] (b) students must seek special accommodation to obtain accessible desks and classroom furniture; (c) students must ask a teacher to relocate a classroom when they find that the assigned classroom is not accessible;[85] and (d) students must identify and seek barrier removal if they encounter inaccessible paths of travel.[86]

The District concedes that to receive an accommodation of any kind—including basic services such as accessible furniture and transportation to otherwise inaccessible parts of campus—each disabled student must fill out certain forms prior to the beginning of each semester.[87] By continuing to require disabled students to request accommodation in this manner, the District has failed to operate its facilities and services in a non-discriminatory manner.[88] Cf. *Bacon*, 386 F.Supp.2d at 708;

---

83. Garber Decl., Exh. A.

84. *Id.* The handbook states that "[a]ll parking is available on a first-come-first-serve basis. Parking is not reserved for students with disabilities. Students may wish to schedule their classes at times that are not as crowded as other times." (*Id.*) Notably, Huezo previously asserted that even with a key card to enter faculty parking lots, he still had difficulty accessing classroom buildings at Pierce College due to the lack of accessible paths of travel to class. (See February 27, 2007 Order at 26 n. 62).

85. The District will not relocate classes if they are offered at different locations, or if the nature of the programs would be fundamentally altered by relocation. (Garber Decl., Exh. A). Huezo notes that all classes on the upper campus are inaccessible due to inaccessible parking and paths of travel. (Pl.'s Reply at 10).

86. Garber Decl., Exh. A. Huezo has asked for curb cuts and accessible ramps for the last three years without success. (Pl.'s Reply at 10).

87. Def.'s Opp. at 7; Silva Decl., Exh. I.

88. Citing several opinions of the Office of Civil Rights, the District argues that at the college level, the student must request accommodation. (Def.'s Opp. at 12). The court, however, has determined that the ADA and Rehabilitation Act place an affirmative duty on the public entity to operate its services, programs, or activities in a non-discriminatory manner. (February 27, 2007 Order at 22–29). It has concluded that by requiring disabled students to point out barriers to access and seek accommodations, the District has violated the ADA and § 504 of the Rehabilitation Act by excluding Huezo from participation in and denying him the benefits of its services, programs, and activities, or otherwise discriminating against him on the basis of his disability.

Opinions of the Office of Civil Rights are not binding on the court, and the opinions defendant cites are factually distinguishable, as the majority relate to students with learning disabilities who required additional time for test taking or changes in course work. See *R.K. ex rel. T.K. v. Hayward Unified School Dist.*, C 06–07836 JSW, 2007 WL 2778730, *9 n. 6 (N.D.Cal. Sept. 21, 2007) ("Plaintiff also relies on an administrative ruling from the Office of Civil Rights ('OCR'). This ruling is not binding on this Court. Moreover, the Court finds the administrative

*Putnam,* 1995 WL 873734 at *10.

Furthermore, the District makes no real attempt to address the specific modifications in policies and procedures Huezo seeks. Although the District has appointed Sylvia Silva as Pierce College's ADA Coordinator, Silva has done nothing other than consult on the creation of the Special Services Student Handbook and create various "ADA compliant" forms.[89] There is no evidence that Silva has expertise in Title II and the ADAAG regulations, particularly the use and placement of accessible equipment in schools.[90] Nor does the District address Huezo's request that teachers be responsible for requesting accessible desks and equipment as required. Although defendant states that teachers have been given ADA training, it does not discuss the content of the training or define what responsibilities teachers have vis-à-vis disabled students.

In sum, the court concludes that the District's programmatic response to the pervasive lack of curb cuts, accessible paths of travel, and accessible desks and workstations does not meet the § 35.150's requirement that a public entity "operate *each* service, program, or activity so that the service, program, or activity, *when viewed in its entirety,* is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a) (emphasis added). This is particularly true given that the District continues to place the burden on disabled students to identify barriers—e.g., lack of accessible workstations, inaccessible paths of travel—and request accommodation. Furthermore, Huezo has demonstrated that he will continue to take classes at Pierce College[91] and continue to suffer irreparable injury due to the numerous access barriers he encounters as a result of the District's policies and procedures.[92]

Because he has shown a likelihood that he will suffer irreparable injury and the inadequacy of remedies at law, the court grants Huezo's request for interim modifications to the District's policies and procedures. The court hereby enjoins the District to provide accessible desks, workstations, and other equipment with priority signage in all classrooms in use

ruling is not persuasive because it does not contain any analysis of the elements of a claim under Section 504, it was based on a settlement between the OCR and the CDE, and because it is factually distinguishable"). The court notes, moreover, that the District did not make an argument based on the OCR opinions in opposing Huezo's motion for partial summary judgment. That, of course, was the proceeding in which the accommodations issue was actually decided.

89. Silva Decl., ¶¶ 2–4.

90. Pl's Mot. at 19.

91. Huezo Decl., ¶ 3 ("Although I have now finished my degree program, I remain enrolled at Pierce College in classes like Architecture as well as in other subjects, and plan to continue taking such classes. I also attend, and plan to continue attending, public functions such as the recent art show in the Arts Building").

92. Cf. *L.H. v. Schwarzenegger,* CIV 06–2042 LKK/GGH, 2008 WL 268983, *9 (E.D. Cal. Jan. 29, 2008) ("Here, the plaintiffs have shown that there is a fair chance they will succeed in proving that the defendants do not comply with the ADA in parole revocation proceedings. Additionally, the possibility that the affected plaintiffs would consequently suffer discrimination that would impede their ability to participate in proceedings in which their liberty rights are at stake demonstrates the likelihood of irreparable injury"); *Burriola v. Greater Toledo YMCA,* 133 F.Supp.2d 1034, 1040 (N.D.Ohio 2001) ("Additionally, the irreparable harm requirement is met when the injuries plaintiff would incur are 'the very type of injuries Congress tried to avoid.' *E.E.O.C. v. Chrysler Corp.,* 733 F.2d 1183, 1186 (6th Cir.1984). Because Jordan's injuries would be the result of discrimination based on disability, they are the very type of injuries Congress sought to avoid in enacting the ADA," citing 42 U.S.C. § 12101(b)).

during a given semester; to hire an ADA access expert approved by plaintiff responsible for overseeing the placement of accessible desks, tables, and other workstations in all classrooms in use;[93] to cease charging disabled students for parking permits to use the teachers' parking lots and keys to the library elevator; to provide regularly scheduled shuttle service for disabled students; to update the Special Services Student Handbook to reflect these changes; and to publicize the existence and availability of the handbook as a resources for disabled students.[94]

**b.   Physical Barriers**

■ In its order granting Huezo's motion for partial summary judgment, the court noted that "[o]ne form of prohibited discrimination is the exclusion from a public entity's services, programs, or activities

---

**93.** Huezo has also asked that the court require the District to impose responsibilities on teachers respecting accommodation of disabled students and the provision of accessible desks and equipment. The court declines to determine who within the District or with Pierce College should bear responsibility for ensuring that disabled students have accessible desks and other necessary equipment. The court concludes that enjoining the District to develop policies that will ensure the availability of such accommodations is adequate.

**94.** Cf., e.g., *Anderson v. Rochester–Genesee Regional Transp. Authority*, 337 F.3d 201, 206 (2d Cir.2003) (affirming in part that grant of injunctive relief that encompassed the following remedial measures: (1) " 'The company must provide next-day ride service to all ADA paratransit eligible individuals who require such service' "; (2) " '[T]he company shall take whatever steps are necessary to obtain more buses, drivers and schedulers to comply with all of the requirements concerning provision of paratransit service' "; (3) " '[T]he company will phase in modifications to its reservation system to permit advance reservations to be made not more than three days prior to the desired trip' "; and (4) "The company shall 'provide the Court with [monthly] reports' on demand rides, subscription rides, and the certification/recertification process' "); *L.H.*, 2008 WL 268983 at *9 ("[T]he court issues a preliminary injunction to require defendants to develop sufficiently specific draft Policies, Procedures, and Plans ('Policies and Procedures') that will ensure continuous compliance with all of the requirements of the Americans with Disabilities Act in parole revocation proceedings. Defendants will promptly disseminate their Policies and Procedures in an effective manner. The Policies and Procedures must ensure that Juvenile Parolees with effective communication needs (including but not limited to mental illness, other cognitive or communication impairments, illiteracy, limited English-language proficiency, and the need for a foreign language interpreter) and/or disabilities are able to participate, to the best of their abilities, in all parole revocation proceedings. The Policies and Procedures shall include detailed procedures for accommodating and effectively communicating with Juvenile Parolees with Disabilities and/or effective communication needs at all Parole Revocation Proceedings"); *Lonberg II*, 2007 WL 2005177 at *8 ("By ordering the City to bring all of the curb ramps and sidewalk segments identified on Exhibit A ... in[to] full compliance with the federal and state standards, the Court is promoting the Congressional objective of eliminating physical obstacles and preventing discrimination against disabled persons. Further, the repeated and significant difficulty Plaintiff encounters when attempting to use the non-compliant streets and sidewalks is a real and immediate threat of substantial and irreparable harm and it is exactly the type of discrimination that the ADA seeks to prevent. *Barden v. City of Sacramento*, 292 F.3d 1073, 1075–1077 (9th Cir.2002). The Court finds that the public interest would be greatly served by the issuance of an injunction requiring the City to comply with the ADA and California's disability access laws. Indeed, when passing the ADA Congress found that '[t]he employment, transportation, and public accommodation sections of ... [the ADA] would be meaningless if people who use wheelchairs were not afforded the opportunity to travel on and between the streets,' " quoting *Kinney v. Yerusalim*, 9 F.3d 1067, 1071 (3d Cir.1993)).

because of the inaccessibility of the entity's facilit[ies]." [95] *Barden v. City of Sacramento*, 292 F.3d 1073, 1075 (9th Cir.2002). Huezo has proffered uncontroverted evidence that the Pierce College campus has significant physical barriers that discriminate against persons with mobility disabilities. Indeed, the court previously found that when not driving around campus, Huezo has considerable difficulty maneuvering around the myriad physical barriers he encounters.[96] Sidewalks do not have curb cuts, requiring that he utilize steep, narrow roads filled with potholes to travel from building to building.[97] Many ramps are steep, have no handrails, or have been obstructed.[98] Huezo attempts to utilize his prosthetic legs more frequently to lessen the impact of these physical barriers as he tries to access the services, programs, and activities of Pierce College, but doing so is painful and tiring, and exposes him to sores, back problems, and "other" painful conditions.[99]

Huezo represents that since the court granted partial summary judgment, he has attempted to work with the District to get it to remove physical barriers and create accessible paths of travel throughout campus by installing curb cuts, fixing steep ramps, adding handrails, and renovating accessible parking so that it is configured and located near accessible paths on campus.[100] He asserts that the District has not agreed to make the renovations he has requested, in part because it contends that Pierce will undergo massive renovations in the future. Huezo has been unable to obtain information about the timing of the planned renovation, however.[101] He therefore requests that the court order the District to make the interim renovations that his expert, Peter Margen, has determined are most important to operate the college as readily accessible for persons with mobility disabilities.[102] Huezo has provided a "Demand for Interim Barrier Removal," that identifies more than 150 barriers for removal.[103] They include improvements to parking lots, installation of curb ramps, installation of handrails on ramps, changes to the slope angle of excessively steep ramps, installation of automatic doors, installation of accessible shower facilities, and lowering paper towel dispensers in restrooms.[104]

The District responds that various barrier removal projects are currently underway at Pierce College.[105] It states that Pierce College's President, Robert Garber, and Director of College Facilities, Paul Nieman, met with Margen and reviewed the campus with him to address barriers Huezo sought to have removed.[106] The parties agreed that the District would await a report from Margen, that it would deal with those issues that could be addressed immediately, and that it would also attempt to make changes that could be accomplished over time, bond money permitting.[107] The District did not receive

---

95. See February 27, 2007 Order at 22.

96. *Id.* at 26.

97. *Id.*

98. *Id.*

99. *Id.*

100. Pl.'s Mot. at 22.

101. *Id.*

102. *Id.*

103. Barbosa Decl., Exh. 4.

104. *Id.*

105. Def.'s Opp. at 9.

106. *Id.* Garber and Nieman do not state when this meeting took place. (Garber Decl., ¶ 7; Nieman Decl., ¶ 3).

107. Def.'s Opp. at 9.

Margen's until six months after the meeting.[108]

The District has submitted a document addressing every item on Huezo's interim barrier removal demand.[109] The document reflects what corrective work is recommended, what work Pierce College will perform, and the status of that work as of March 27, 2008.[110] It represents that the removal of many of the identified barriers is either complete or in progress, or that the barrier is no longer in existence.[111]

On May 20, 2008, Nieman prepared an updated status report regarding ongoing corrective work.[112] It reports that the following renovations have been completed: provision of accessible parking spaces at the Field House parking lot; installation of accessible hardware on doors in the South Gym, Life Sciences Building, History Building, Library, and Architecture Building; modifications to restrooms in the South Gym, Math Building, Computer Science Building, Library, and Architecture Building; provision of wheelchair-seating spaces in the Learning Center; and installation of signage for access to the Library.[113] Numerous other projects are in progress, or scheduled for the future.[114] The District notes that the Transition Plan identifies the barriers to be corrected, their location, the recommended correction, and the cost of the modification.[115]

Garber states that Pierce College has contracted with Swinerton to classify items in the transition plan in three categories: (1) items that will be completed under a current bond project; (2) items that are not covered by a current bond project; and (3) items that are complete.[116] Given its progress in barrier removal, the District argues that a permanent injunction is not necessary.

The court appreciates that the extensive renovations necessary to make Pierce College readily accessible will take time. The District, however, has provided minimal details regarding the timing of some of the most necessary work. The District's Transition Plan, for example, does not set forth a schedule for taking the steps necessary to achieve accessibility. Nieman's status update provides greater detail, but indicates that some of the renovation projects will not commence for some time. Renovations to the Gym Building, for instance, will not begin until December 2008.[117] Parking Lot 1 and the Ag–Sciences Building are not scheduled to be renovated until Fall 2009.[118] No start date for work on items included in the "North of Mall Renovations" is provided.[119] Furthermore, with respect to particular barriers such as curb cuts and steep ramps, Nieman states only that they are "under review for means/methods & possible DSA review." [120]

108. *Id.;* Nieman Decl., ¶ 3; Garber Decl., ¶ 7.

109. Nieman Decl., Exh. D ("Attachment A to Consent Decree–Injunctive Relief").

110. *Id.*

111. *Id.,* ¶ 4.

112. *Id.,* Exh. E.

113. *Id.*

114. *Id.*

115. Def.'s Opp. at 9.

116. Garber Decl., ¶ 11, Exh. B. This document, which is undated, identifies no work that has been completed. (*Id.,* Exh. B).

117. Nieman Decl., Exh. E. The court notes that the only evidence offered regarding the scheduling of these renovations is found in one-line notations in Nieman's status update. The District provides no other information confirming the schedule of necessary barrier removal.

118. *Id.*

119. *Id.*

120. *Id.*

Given its earlier holding that the numerous physical barriers on the Pierce College campus discriminated against Huezo on the basis of his disability, the court cannot accept the District's view that an injunction is unnecessary at the present time. It is undisputed that Huezo is still unable to travel to his architectural classes because there are no curb cuts along the walkways; is still unable safely to use ramps around the Math Building that are too steep and do not have handrails; and must still move his car or seek a special van ride to reach portions of campus that are inaccessible due to lack of accessible parking lots and paths of travel.[121] The District argues that the balance of hardships tips in its favor, "in light of the DSPS and myriad of non-structural program access [methods] available to students with disabilit[ies], and in light of the proven dedication of Pierce College to comply with the ADA through program changes and barrier removal."[122] The District, however, does not identify precisely what hardship it will suffer by being required to comply with its obligations under the ADA and the Rehabilitation Act in a timely fashion.

The court accepts the District's representation that it is endeavoring to remove barriers on campus. The fact that it will not begin certain of the renovations for six months to a year, however, coupled with its failure to provide a specific time frame for completion of important renovation work, such as the creation of curb cuts and modification of ramps, shows that the current pace of barrier removal is inadequate. Huezo, moreover, has demonstrated that he will continue to take classes at Pierce College and therefore continue to suffer irreparable injury due to the numerous physical barriers to access. Accordingly, Huezo has shown he is entitled to a permanent injunction requiring the interim removal of barriers at Pierce College. The District is therefore enjoined to use its best efforts to remove interim barriers by December 31, 2008, making those related to paths of travel to classes and parking areas on campus a priority.[123] Cf. *Lonberg II*, 2007 WL 2005177 at *8.

### 3. Monitoring

Huezo argues that any permanent injunction must include a monitoring program to ensure that the District is complying with its obligation to modify its policies and procedures and remove interim physical barriers.[124] Given the District's persistent delays in making Pierce College readily accessible, the court agrees that monitoring is necessary. Accordingly, the court directs that the access expert/consultant the District has been ordered to hire monitor and oversee the progress of corrective work and implementation of modified policies. The access expert must submit status reports to the parties every three months following issuance of the injunction until the renovation work is complete. The status reports must identify the work completed, and the work that remains to be completed. Additionally, in the event the District is unable to remove all interim barriers on or before December 31, 2008, the District must notify plaintiff's counsel in writing within thirty days of learning that removal of a particular barrier will not be completed by the end of the year, state the reason for the delay, advise of the steps the District intends to take to

---

121. Supplemental Declaration of Marvin Huezo ("Huezo Supp. Decl."), ¶¶ 2–3.

122. Def.'s Opp. at 11.

123. In his Demand for Interim Barrier Removal, Huezo requests that much of the work

be completed by the end of June 2008. (Barbosa Decl., Exh. 4). This accelerated schedule is impracticable given the amount of work to be performed and the fact that Huezo's motion was not heard until June 16, 2008.

124. Pl.'s Mot. at 23.

complete the work, and identify the anticipated completion date.

## III. CONCLUSION

For the reasons stated, the court grants Huezo's motion for permanent injunctive relief.